The State of Ohio, Appellee, *v.* Bayless, Appellant.

74

(No. 75-149—Decided November 24, 1976.)

78

*Mr. Stephan M. Gabalac,* prosecuting attorney, and *Mr. Frederic L. Zuch,* for appellee.

*Messrs. Mills, Heiser, Pullen, McIntyre & Holland, Mr. William R. Holland, Messrs. Metz & Ludwig, Mr. Mark H. Ludwig, Messrs. Parms, Purnell, Williams & Stubbs* and *Mr. Norman Purnell,* for appellant.

## I

STERN, J. In five separate cases, decided on July 2, 1976, the United States Supreme Court held that the death penalty was not unconstitutional *per se* as cruel and unusual punishment. *Gregg* v. *Georgia* (1976), —— U. S. ——, 49 L. Ed. 2d 859; *Proffitt* v. *Florida* (1976), —— U. S. ——, 49 L. Ed. 2d 913; *Jurek* v. *Texas* (1976), ——U. S. ————, 49 L. Ed. 2d 929; *Woodson* v. *North Carolina* (1976), —— U. S. ——, 49 L. Ed. 2d 944; *Roberts* v. *Louisiana* (1976), —— U. S. ——, 49 L. Ed. 2d 974. The court upheld the imposition of the death penalty under statutes in Georgia, Florida, and Texas, while striking down death penalty statutes in Louisiana and North Carolina. We are now presented with the question of whether the Ohio statutes imposing the death penalty are constitutional in light of those decisions.

Following the decision in *Furman* v. *Georgia* (1972), 408 U. S. 238, Ohio adopted R. C. 2929.02 which prescribes the death penalty or life imprisonment for the crime of aggravated murder. The procedure for determining whether the death sentence is to be imposed is set out in R. C. 2929.03 and 2929.04. Those statutes permit the death penalty only where one or more aggravating factors is specified in the indictment and proved beyond a reasonable doubt. The aggravating circumstances include: assassination of the President, Vice-President, Governor, Lieutenant Governor, or a person who has been elected to or is a can-

didate for any such office; murder for hire; murder to escape accountability for another crime; murder by a prisoner; repeat murder or mass murder; killing a law enforcement officer; and murder in the course of certain felonies.[1]

[1] R. C. 2929.02. "(A) Whoever is convicted of aggravated murder in violation of Section 2903.01 of the Revised Code shall suffer death or be imprisoned for life, as determined pursuant to Sections 2929.03 and 2929.04 of the Revised Code. In addition, the offender may be fined an amount fixed by the court, but not more than twenty-five thousand dollars.

"(B) Whoever is convicted of or pleads guilty to murder in violation of Section 2903.02 of the Revised Code shall be imprisoned for an indefinite term of fifteen years to life. In addition, the offender may be fined an amount fixed by the court, but not more than fifteen thousand dollars.

"(C) The death shall not impose a fine in addition to imprisonment or death for aggravated murder, or in addition to imprisonment for murder, unless the offense was committed with purpose to establish, maintain, or facilitate an activity of, a criminal syndicate as defined in Section 2923.04 of the Revised Code, or was committed for hire or for purpose of gain.

"(D) The court shall not impose a fine or fines for aggravated murder or murder which, in the aggregate and to the extent not suspended by the court, exceeds the amount which the offender is or will be able to pay by the method and within the time allowed without undue hardship to himself or his dependents, or will prevent him from making reparation for the victim's wrongful death."

R. C. 2929.03. "(A) If the indictment or count in the indictment charging aggravated murder contains no specification of an aggravating circumstance listed in division (A) of Section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge, the trial court shall impose sentence of life imprisonment on the offender.

"(B) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of Section 2929.04 of the Revised Code, the verdict shall separately state whether the accused is found guilty or not guilty of the principal charge and, if guilty of the principal charge, whether the offender is guilty or not guilty of each specification. The jury shall be instructed on its duties in this regard, which shall include an instruction that a specification must be proved beyond a reasonable doubt in order to support a guilty verdict on such specification, but such instruction shall not mention the penalty which may be the consequence of a guilty or not guilty verdict on any charge or specification.

The trier of fact may be either a jury or, if waived, a three-judge panel; it is to consider first whether the defendant is guilty of the charge, and if found guilty, whether he is also guilty of one or more of the specifications. If the defendant is found guilty of the charge and innocent of the

---

"(C) If the indictment or count in the indictment charging aggravated murder contains one or more specifications of aggravating circumstances listed in division (A) of Section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge but not guilty of each of the specifications, the trial court shall impose sentence of life imprisonment on the offender. If the indictment contains one or more specifications listed in division (A) of such section, then, following a verdict of guilty of both the charge and one or more of the specifications, the penalty to be imposed on the offender shall be determined:

"(1) By the panel of three judges which tried the offender upon his waiver of the right to trial by jury;

"(2) By the trial judge, if the offender was tried by jury.

"(D) When death may be imposed as a penalty for aggravated murder, the court shall require a pre-sentence investigation and a psychiatric examination to be made, and reports submitted to the court, pursuant to Section 2947.06 of the Revised Code. Copies of the reports shall be furnished to the prosecutor and to the offender or his counsel. The court shall hear testimony and other evidence, the statement, if any, of the offender, and the arguments, if any, of counsel for the defense and prosecution, relevant to the penalty which should be imposed on the offender. If the offender chooses to make a statement, he is subject to cross-examination only if he consents to make such statement under oath or affirmation.

"(E) Upon consideration of the reports, testimony, other evidence, statement of the offender, and arguments of counsel submitted to the court pursuant to division (D) of this section, if the court finds, or if the panel of three judges unanimously finds that none of the mitigating circumstances listed in division (B) of Section 2929.04 of the Revised Code is established by a preponderance of the evidence, it shall impose sentence of death on the offender. Otherwise, it shall impose sentence of life imprisonment on the offender."

R. C. 2929.04. "(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to Section 2941.14 of the Revised Code, and is proved beyond a reasonable doubt:

"(1) The offense was the assassination of the president of the United States or person in line of succession to the presidency, or of the governor or lieutenant governor of this state, or of the president-elect or vice president-elect of the United States, or of the governor-elect or lieutenant governor-elect of this state, or of a candidate for any of

specifications, a sentence of life imprisonment is imposed, and possibly a fine. If the defendant is found guilty of the charge and guilty of one or more of the specifications, a separate hearing is held before the trial judge or the three-judge panel to determine whether mitigating circumstances

the foregoing offices. For purposes of this division, a person is a candidate if he has been nominated for election according to law, or if he has filed a petition or petitions according to law to have his name placed on the ballot in a primary or general election, or if he campaigns as a write-in candidate in a primary or general election.

"(2) The offense was committed for hire.

"(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

"(4) The offense was committed while the offender was a prisoner in a detention facility as defined in Section 2921.01 of the Revised Code.

"(5) The offender has previously been convicted of an offense of which the gist was the purposeful killing of or attempt to kill another, committed prior to the offense at bar, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

"(6) The victim of the offense was a law enforcement officer whom the offender knew to be such, and either the victim was engaged in his duties at the time of the offense, or it was the offender's specific purpose to kill a law enforcement officer.

"(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary.

"(B) Regardless of whether one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment and proved beyond a reasonable doubt, the death penalty for aggravated murder is precluded when, considering the nature and circumstances of the offense and the history, character, and condition of the offender, one or more of the following is established by a preponderence [preponderance] of the evidence:

"(1) The victim of the offense induced or facilitated it.

"(2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation.

"(3) The offense was primarily the product of the offender's psychosis or mental deficiency, though such condition is insufficient to establish the defense of insanity."

exist which preclude imposition of the death penalty. A pre-sentence investigation and a psychiatric examination of the defendant are required to be made before the hearing, and other evidence and testimony may be submitted, including any statement by the defendant. The death penalty is to be imposed if the trial judge or the three-judge panel unanimously finds that none of three possible mitigating factors has been established to exist by a preponderance of the evidence.

The mitigating factors are that:

(1) The victim of the offense induced or facilitated it;

(2) It is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation; and

(3) The offense was primarily the product of the offender's psychosis or mental deficiency, although such condition is insufficient to establish the defense of insanity.

Essentially, it may be seen that the Ohio statutes provide for a bifurcated trial, in which the issues of guilt, of the charge and of certain statutorily defined aggravating factors, are determined by the jury or, if waived, by a three-judge panel, and issues of mitigation are determined by the trial judge or by the three-judge panel. If the sentence of death is affirmed by a Court of Appeals, a further appeal as a matter of right may be taken to this court. Section 2(B)(2)(a)(ii), Article IV of the Ohio Constitution.

This statutory scheme differs somewhat from any of those considered by the United States Supreme Court in its July 2, 1976, decisions, but it is basically similar to the Georgia, Florida, and Texas statutes which the court found to be constitutional. Each of those statutes provide for a bifurcated trial, with a separate sentencing hearing to consider information relevant to the imposition of sentence, under standards to guide the sentencing authority in the use of that information. The statutes in North Carolina and Louisiana which were struck down imposed mandatory

death sentences, with no "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of the sentence of death." *Woodson* v. *North Carolina, supra* (49 L. Ed. 2d 944), at page 960. The court did not, however, establish specific standards for imposition of the death penalty, but rather considered each state's statutory procedures to determine whether the concerns expressed by the court in *Furman* v. *Georgia, supra,* that the death penalty not be imposed capriciously or in a freakish manner, had been allayed.

The court expressed the principle underlying its five separate decisions in these words:

"In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

"We do not intend to suggest that only the above-described procedures would be permissible under *Furman* or that any sentencing system constructed along these general lines would inevitably satisfy the concerns of *Furman*, for each distinct system must be examined on an individual basis. Rather, we have embarked upon this general exposition to make clear that it is possible to construct capital-sentencing systems capable of meeting *Furman's* constitutional concerns." *Gregg* v. *Georgia, supra* (49 L. Ed. 2d 859), at page 887 (footnotes omitted).

It cannot be claimed that punishment by death in Ohio is excessive because it is grossly disproportional to the severity of the crime, for death is imposed only in cases of purposeful murder, and only when one or more specific aggravating factors are also present. Nor can it be fairly

charged that Ohio's statutes are likely to result in capricious, arbitrary, and discriminatory death sentences. More clearly than any of the states whose statutes were reviewed by the high court, Ohio has attempted to insulate the determination of guilt and of sentence from any likelihood of jury arbitrariness. The jury is directed to determine only guilt or innocence and whether the defendant is guilty beyond a reasonable doubt of one or more aggravating factors specified in the indictment. The ambit of their responsibility is thus virtually the same as in any other criminal trial. The possibility does exist, of course, that jurors might disregard their oaths and vote upon the aggravating specifications according to whether they believe the defendant deserves the death penalty, but that possibility does not seem a substantial one. The jury instructions are not to mention the penalty which might be a consequence of the jury's verdict on the charge and the specifications, thus emphasizing the role of the jury in determining only facts not punishment, and the specifications themselves require only simple factual determinations, such as whether the victim was a high public official or a law enforcement officer and whether the offense was committed for hire, to escape detection or punishment, or in connection with certain other offenses such as kidnapping, aggravated robbery, or rape. The likelihood that prejudice, emnity, bias or sympathy would significantly affect the jury's findings of fact on such issues appears slight. Further, the explicit nature of the specifications allows effective judicial review of whether the jury's verdict was supported by the evidence.

   *Gregg* v. *Georgia* specifically decided that the concerns expressed in *Furman* v. *Georgia* are adequately met and, as a general proposition, best met by a "system that provides a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Gregg* v. *Georgia, supra,* at page 887. Ohio conforms to this description quite close-

ly. Sentence is determined at a separate hearing, and only after the pre-sentence investigation and a psychiatric examination. Testimony and other evidence may also be submitted at this hearing. On the basis of this information, and considering the nature and circumstances of the offense and the history, character and condition of the offender, the trial judge or the three-judge panel are then to determine whether one or more of the three statutory mitigating factors have been proved by a preponderance of the evidence. The mitigating factors, as with any legislation, may require judicial interpretation and clarification, but they are basically reasonable and similar to these approved in *Proffitt* v. *Florida, supra* (49 L. Ed. 2d 913), and they do clearly guide the sentencing judge or judges in their decision. In addition, this court has a particular opportunity and responsibility to assure that death sentences, which may be brought to this court for review as a matter of right, are not imposed arbitrarily and capriciously. We have in this case, and will in all capital cases, independently review the aggravating and mitigating circumstances presented by the facts of each case to assure ourselves that capital sentences are fairly imposed by Ohio's trial judges.

The General Assembly might properly have included other mitgiating circumstances (see *Proffitt* v. *Florida, supra,* at page 921), or declined to list specific mitigating circumstances (see *Gregg* v. *Georgia, supra,* at page 870), but we conclude that those which are listed do direct inquiry both to the circumstances of the crime and to the individual culpability of the defendant, and so adequately guide the decision of the sentencing authority. It is a delicate legislative task to provide standards which are not arbitrary, yet which allow meaningful consideration of the defendant and his crime; and it is an essential judicial task to assure that those standards be strictly construed in favor of the defendant, to allow the broadest consideration of mitigating circumstances consistent with their language. We perceive no distinction of constitutional dimensions

between Ohio's mitigating factors, so construed, and those upheld in *Proffitt* v. *Florida, supra.*[2]

The only claim of mitigation raised in this case was that the defendant was "mentally deficient." The application of that standard to this defendant is discussed *infra*. Insofar as this case raises the question of whether that standard for mitigation is too narrow, we are unable to find that the decision of the General Assembly to allow mitigation of sentence for those who are mentally deficient, but not of other mental disorders not constituting psychosis or amounting to insanity, falls outside the proper scope of its authority to assign responsibility and punishment for criminal offenses.

In *Gregg* v. *Georgia, supra*, at page 888, the court also considered other attacks upon the imposition of the death penalty, including attacks upon the existence of discretion at the prosecution, the conviction, and the executive clemency stages of the criminal justice system. The court found such matters not to be constitutionally determinative, and they need not be considered here. Under the court's decisions in *Gregg* v. *Georgia et al.*, Ohio's statutory framework for the imposition of capital punishment is constitutional and does not impose cruel and unusual punishment within the meaning of the Eighth Amendment. The defendant's eleventh and twelfth propositions of law are overruled.

II

Defendant's third and fourth proposition of law raise related claims concerning inquiry into veniremen's opinions concerning capital punishment. Defendant claims, first, that, under Ohio's statutory provision for prosecution of aggravated murder, inquiry into a venireman's opinion on capital punishment is not permitted over the ob-

---

[2]The major differences are that the Florida statute permits consideration of the age and prior criminal record of the defendant, of more broadly defined mental and emotional disturbances and impairments, and of the fact that the defendant was an accomplice with only a minor role in the crime.

jection of the defendant; and second, that the exclusion of certain veniremen in this case was in violation of the standards set forth by the United States Supreme Court in *Witherspoon* v. *Illinois* (1968), 391 U. S. 510.

Defendant's first contention is basically that Ohio's statutory provisions for imposing capital punishment has taken the sentencing decision out of the juror's hands, and that inquiry concerning their potential opposition to capital punishment is improper and irrelevant to the jury's limited mission of determining only guilt or innocence, not punishment.

That argument would have some force if a trial judge excused jurors for cause solely because of their opposition to capital punishment. There is no specific provision in Crim. R. 24 for a challenge for cause because of opposition to capital punishment, and to allow such challenges because of a venireman's ethical and political beliefs would unjustifiably exclude a large group of potential jurors and deprive the defendant and society as a whole of a jury which is a representative cross section of the community. However, an examination of the record makes it clear that the trial judge did not excuse any prospective juror for cause simply because of his opposition to capital punishment; rather, he excused for cause only those veniremen who stated that they could not follow their oath and render a fair and impartial finding based on the evidence, knowing that a finding of guilty of the charge and one or more of the specifications might result in a death sentence. Veniremen who stated that they were opposed to capital punishment, but could follow their oath and vote in accordance with the evidence were not excused. Indeed, the record of the *voir dire* in this case provides a convincing demonstration of the need for such inquiries in capital cases. Six veniremen opposed to capital punishment were excused for the reason stated above. Two prospective jurors were excused because they favored capital punishment, and would have a strong desire to return a guilty finding on one of the specifications, in order to permit the death penalty, if they first

found the defendant guilty of the charge. It is apparent from this experience in one of the first trials conducted in accordance with Ohio's new procedures for capital cases that the attitude toward capital punishment held by many individuals, both opposed and in favor, presents real and serious problems for the impanelling of a fair and impartial jury. Despite the fact that capital case jurors are to consider only guilt, and that sentencing is left to the trial judge, we see in the record of this *voir dire* that a prospective juror's opinion on capital punishment often does prevent him from impartially applying the law, as it is given in the court's instructions, to the facts as he finds them.

The essential purpose of the jury in our legal system is to determine the facts according to law fairly and impartially, and the trial court excluded only those potential jurors whose views on capital punishment prevented them doing so. Upon the record of this cause, it was necessary and proper for the court to do so, under Crim. R. 24-(B) (14), which permits challenge for cause of a person "otherwise unsuitable for any cause to serve as a juror."

A further contention of the defense is that the exclusion of such veniremen rests upon the unsupported supposition that if a venireman were not informed of the possibility of a death sentence, and if he later learned inadvertently that his vote might lead to the death penalty, he might not vote impartially on the specifications. The defense suggests that prospective jurors should not be questioned concerning their views on capital punishment unless defense counsel waives his objection, but should be emphatically instructed to permit no discussion whatsoever of any penalty. The essential thesis of this contention is that capital-case jurors can be effectively kept in ignorance of the possible outcome of their verdict, or that instructions can overcome any impartiality. As to the latter point, the *voir dire* in this case has plainly shown that instructions alone would not be sufficient for some potential jurors; those excused stated that in this case they could

not follow such instructions. In addition, R. C. 2929.03 provides that instructions to the jury shall not mention the penalty. With regard to the former point, we cannot agree that it is preferable or even possible that the jury be prevented from knowing that their verdict might result in the defendant's execution. Certainly many potential jurors are aware that Ohio has reinstituted the death penalty for aggravated murder, and some may well be familiar with the system of aggravating specifications which permits imposition of the death penalty. Public awareness will also increase as more trials follow this new system. It is highly unlikely that a jury panel in a case of aggravated murder with specifications could be chosen, none of whose members know that capital punishment might result from the verdict. Impanelling jurors in reliance on any such unrealistic assumption is so likely to result in juries with members who cannot render an impartial finding that it approaches, if it does not reach, absolute certainty. Reliance on the legal ignorance of jurors might also lead to refusal to render a guilty verdict by those jurors who were unsure whether that verdict alone might lead to the death penalty. It would seem to make necessary, as well, the banning of any references to the death penalty by counsel, even by defense counsel who would wish to impress on jurors the seriousness of their task.

Any exclusion of a class of jurors necessarily impinges upon the function of the jury to represent a cross section of the community. But while that is an important jury function, at least equally important is the jury's function of deciding cases fairly and impartially according to law. No technical test and no attempt to exclude from consideration factors which demonstrably prevent jurors from being impartial is an adequate substitute for impartiality as a fact. In the instant case, a result of the inquiries on *voir dire* was that eight potential jurors out of 53 who were questioned were excluded because they could not render a fair and impartial finding due to their opinions on capital punishment. The trial court was justified in finding that

these veniremen were subject to challenge under Crim. R. 24(B)(14), in that they were "otherwise unsuitable for any other cause to serve as a juror."

The defendant contends also that the discharge of these veniremen for cause, and over objection, was error under *Witherspoon* v. *Illinois, supra* (391 U. S. 510). In that case, the court held, at page 522, that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The thrust of the defendant's argument is that potential jurors were excused who did not *unmistakably* state that they would be prevented from rendering a fair and impartial verdict because of their opinions on capital punishment. This argument is directed to the *voir dire* of one juror, who responded to questions of whether she could fairly follow the law by saying "I don't think so" and "I doubt it," and by stating her belief that there should be some other means of punishment. She was excused for cause.

The defense's argument relies on a passage from a footnote in *Witherspoon, supra* (391 U. S. 510), where the court stated, at page 522:

"We repeat, however, that nothing we say today bears upon the power of a state to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*."

At best, however, this passage is dictum as applied to

92

á statutory scheme, such as Ohio's, which does not permit the jury to consider sentencing. The court, in *Witherspoon*, specifically stated that the narrow issue in that case did "not involve the right of the prosecution to challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt," (*Witherspoon*, at page 513), and stated further that it could not conclude on the basis of the record or data before it "that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increase the risk of conviction". *Witherspoon*, at page 518.

In fact, a reading of the entire opinion persuasively indicates that the court was considering only cases in which the jury decides both guilt and punishment, and intended no reference to a case such as the present one, in which the jury determines only guilt. This is most clearly shown by the fact that the court affirmed the jury's verdict of guilt, and reversed only the sentence. There is, of course, a fundamental difference between the two sorts of proceedings, a difference which was found to be of constitutional proportions in *Gregg* v. *Georgia, supra.*

In taking the punishment decision from the jury, Ohio has taken from it, as well, the responsibility to "express the conscience of the community on the ultimate question of life or death." *Witherspoon*, at page 519. As a result, a juror's opinion concerning capital punishment has no more direct relevance to his task than any of the other opinions which, taken as a whole, form his individual outlook on life. No evidence is presented to this court which would warrant a finding that a juror's opinion on capital punishment is so important for obtaining a representative jury that he should be qualified even if he is likely not to be impartial in voting on the issue of guilt or innocence. There appears to be no reason, and certainly no constitutional reason, why jurors with an opinion concerning capital punishment should be subject to a different and higher legal standard—

to establish a bias or a lack of it—than any other juror, where, as here, the juror is to consider only the question of guilt. We do not think that *Witherspoon*, by dictum or implication, imposes such a standard, and we do not impose it. A juror who, because of his opinion for or against capital punishment, cannot be fair and impartial in determining guilt or innocence, the only task which the General Assembly has set him to, may properly be excused for cause. As Justice Story said many years ago in *United States* v. *Cornell* (1820), 25 Fed. Cas. 650, at pages 655-656:

"* * * To insist on a juror's sitting in a cause where he acknowledges himself to be under influences, no matter whether they arise from interest, from prejudices, or from religious opinions, which will prevent him from giving a true verdict according to law and evidence, would be to subvert the objects of a trial by jury, and to bring into disgrace and contempt, the proceedings of courts of justice. We do not sit here to procure the verdicts of partial and prejudiced men; but of men, honest and indifferent in causes. This is the administration of justice which the law requires of us * * *."

As stated above, we are presented with no evidence in addition to that found inconclusive in *Witherspoon* from which to hold that the exclusion of jurors with conscientious scruples concerning capital punishment substantially increases the likelihood of guilty verdicts, and no legal argument concerning whether, if that is indeed the case, some different standard for exclusion of such jurors should accordingly be adopted in aggravated murder cases in order to assure a representative jury. (But, see, White, The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries, 58 Cornell L. Rev. 1176.) Absent such evidence or legal reasoning, the appropriate standard in a prosecution for aggravated murder with specifications is that a prospective juror may be disqualified if the trial court is satisfied from the examination of the juror that he will not render an impartial finding according to law as to the defendant's guilt or innocence, both of the charge

and of the specifications. The careful examination of prospective jurors in this case was in conformity with this standard, and no error was committed. The defendant's third and fourth propositions of law are overruled.

## III

At the mitigation hearing held after the trial, counsel for the defense argued that the defendant's behavorial and emotional abnormalities constituted a "mental deficiency," as that term is used in the mitigating circumstances set out in R. C. 2929.04(B). The testimony of the psychiatric expert witnesses at the hearing was consistent in finding that the defendant was not psychotic or mentally retarded, and was of about normal or dull normal mental development. Their testimony also indicated that the defendant was emotionally and culturally deprived, and that he was sub-normal in emotional control and conscience. The transcript of the hearing indicates that the term "mental deficiency" was construed by the judge to be essentially equivalent to mental retardation or low intelligence. The trial judge found that no mitigating circumstance had been proved by a preponderance of the evidence, and imposed sentence of death. The defendant contends that the trial judge adopted an unduly narrow construction of the term "mental deficiency," which, he argues, should be construed in favor of a defendant to include, among other conditions, behavorial and emotional abnormalities.

The question which is thus posed is one of statutory construction, for the fundamental responsibility in determining punishment lies with the General Assembly. The decision of the degree of punishment to be assigned for an offense, or of the related question of those circumumstances which should be considered in mitigation of the penalty for an offense, is properly a matter for legislative judgment, so long as due process is accorded and the punishment does not violate the Eighth Amendment's prohibition against cruel and unusual punishments. The General Assembly has broad authority to decide whether certain mental states not amounting to insanity justify mitigation of sentence and preclude imposition of the death penalty.

"Mental deficiency" is not defined in the Revised Code, although the term appears in several places therein. R. C. 2101.24(F), 4111.06, 4141.01(B)(3)(h)(iii). Other sources consistently define the term as meaning a low or defective state of intelligence:

Webster's Third New International Dictionary: "failure in intellectual development resulting in social incompetence that is considered to be the result of defect in the central nervous system and to be accordingly incurable."

Blackiston's New Gould Medical Dictionary (2 Ed.):

"In *psychiatry,* a defect of intelligence existing since birth; it may be *primary* (hereditary or familial), that is, without demonstrated organic brain lesion or known prenatal cause, or *secondary,* that is, associated with a chronic organic brain disorder due to brain tissue anomalies, mongolism, prenatal maternal infectious diseases, or birth trauma. The degree of the defect may be indicated by the intelligence quotient for the specific test employed. 2. *In civil law,* the condition as defined by statute is frequently divided into three grades: idiocy, the lowest; imbecility, the intermediate; and moronity, the highest."

1 Schmidt's Attorney's Dictionary of Medicine:

"A defective state of intelligence. It may be *primary* or *secondary.* Primary mental deficiency is hereditary. It is not based on any visible organic or structural change in the brain. Secondary mental deficiency is associated with a brain defect, disease, or birth injury. In law, mental deficiency is usually divided into three grades: idiocy, imbecility, and moronity. Idiocy is the most severe form; moronity, the mildest. * * *"

A similar definition has been given by the courts which have considered the term. *People, ex rel. Cirrone,* v. *Hoffman* (1938), 255 App. Div. 404, 406, 8 N. Y. S. 2d 83, 85. See, also, *Fisher* v. *United States* (1946), 328 U. S. 463; *Woodruff* v. *State* (1932), 164 Tenn. 530, 547, 51 S. W. 2d 843.

The psychiatric expert witnesses at the mitigation hearing defined the term as basically synonomous with mental retardation.

Although the defense is correct in urging that the term "mental deficiency" must be strictly construed against the state and liberally construed in favor of the defendant (R. C. 2901.04[A]), a court may not, in the guise of construction, disregard the ordinary and accepted meaning of a term. Mental deficiency is consistently defined to mean a low or defective state of intelligence. Construing the term broadly, a deficiency may be severe or mild, and may be hereditary or caused by a brain defect, disease, or injury, or by whatever other condition might cause subnormal intelligence. But it does not include the emotional and behavorial abnormalities claimed to exist by the defense. Because no mental deficiency has been shown in this case, we do not, of course, reach the question of the evidence which would justify a finding that an existing mental deficiency was a primary cause of an offense. The defendant's tenth proposition of law is overruled.

## IV

The defendant's first proposition of law is that massive local pretrial publicity concerning the crime was reasonably likely to prevent a fair trial, and that the trial court erred in failing to grant defense motions for a change of venue.

The city of Akron has only one major newspaper, the Akron Beacon Journal, which circulates throughout Summit County. In the 55 days which elapsed between the murder of the Anthonys and the beginning of jury selection, the Beacon-Journal published at least 40 articles related to the crime or the defendant, in 25 separate issues. Among other matters, the newpaper stories reported: that the victims had been killed "execution-style"; that the defendant had tried to hide from police when arrested at his family's house; that he was believed to be the abductor of another woman (in a fashion similar to the abduction of the Anthonys); that he had been committed as a juvenile for an earlier killing; and that he was a fugitive from the custody of the Ohio Youth Commission in Columbus at the time of the killings. Other stories queried whether the case

provided an example of failure in the state's correctional procedures. The events of the case were also reported on local radio and television stations.

The nature and extent of this publicity plainly threatened the defendant's right to a fair trial before an impartial and unbiased jury. The trial judge properly recognized the existence of this threat and directed all counsel engaged in the trial to refrain from doing anything to jeopardize a fair hearing, under pain of citation for contempt. He then deferred ruling on the defense's motion for a change of venue until after individual inquiries had been made of prospective jurors in the course of *voir dire*.

This court has often approved and recommended deferring rulings upon motions for change of venue until after *voir dire*. *State* v. *Johnson* (1972), 31 Ohio St. 2d 106, 285 N. E. 2d 751; *State* v. *Tingler* (1972), 31 Ohio St. 2d 100, 285 N. E. 2d 710; *State* v. *Kassow* (1971), 28 Ohio St. 2d 141, 277 N. E. 2d 435; *State* v. *Swiger* (1966), 5 Ohio St. 2d 151, 214 N. E. 2d 417.

In *State* v. *Swiger, supra,* paragraph one of the syllabus states:

"The examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion."

There are, of course, rare cases in which local publicity has been so pervasive and prejudicial that inquiry by *voir dire* is unnecessary and a change of venue is constitutionally required (*Rideau* v. *Louisiana* [1963], 373 U. S. 723), and other cases in which a change of venue should be granted in preference to other types of pretrial protective orders, such as those excluding the public and the press. *State, ex rel. Dayton Newspapers,* v. *Phillips* (1976), 46 Ohio St. 2d 457, 351 N. E. 2d 127; *State, ex rel. Beacon*

*Journal Pub. Co.,* v. *Kainrad* (1976), 46 Ohio St. 2d 349, 348 N. E. 2d 695. In general, however, a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality. In this case, a special venire of 150 was drawn. Of those veniremen who were available and not excused for hardship, sickness, or other legal reasons, 53 were examined individually. Nine were excused for cause because they had a fixed opinion of guilt, six were excused for cause because of their opposition to capital punishment and inability to render a fair and impartial finding based on the evidence, and three were excused for other causes, including two who unduly favored capital punishment. The 12 jurors and two alternates were chosen from the remaining panel of 35. The inquiries of the veniremen, as revealed by the record, were thorough. A substantial majority of the potential jurors were aware of some facts concerning the killings, such as the name and occupations of the victims, the name of the park where their bodies were found, and that they had been shot. Some were also aware of further details concerning the crime itself and of the defendant's criminal record, but most claimed that they had paid little attention to the case except for the initial reports of the crime and the defendant's arrest. Of the twelve jurors who tried the case, eight appeared to have no knowledge of the defendant's record and knew at most only that a married couple had been shot in the park. Three members of the jury were aware that the defendant had a prior record, but only one showed a detailed knowledge of the defendant's background, and another believed his record involved only a traffic ticket. Only one of the jurors expressed an opinion that the defendant was guilty, and when questioned by the judge answered that he could render a fair and impartial finding based upon the evidence presented. That juror was accepted by the defense without challenge and without inquiry into the extent of his knowledge of the crime or the defendant's background, presumably because the juror also stated that he was opposed to capital punishment.

Based upon an examination of this record, we concur with the finding of the trial judge that the pretrial publicity in this case did not prevent the impanelling of a fair and impartial jury, and we find no abuse of discretion in the denial of the defense's motion for a change of venue.

The defendant also contends that the trial judge acted improperly in making statements to the press despite the judge's own admonitions against such statements by the attorneys. The only out-of-court comments by the judge which appear in the record are a report that one of the defendant's appointed counsel had bowed out of the case for personal reasons, a further admonishment to police and lawyers after a television interview with a sheriff's captain, a report that a pretrial conference would be scheduled, and a statement to the press that the initial questioning of prospective jurors would be limited to the issues of capital punishment and pretrial publicity. None of those comments were in any way prejudicial to the defendant, and none involved comment upon the facts of the case. The Ohio Code of Judicial Conduct specifically declines to "prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court." The public statements of the trial judge in this case were proper and judicious, and intended to protect the defendant's rights while providing to the public and the press accurate information concerning procedural developments in this highly publicized case. The trial judge properly carried out his official duties and we find no error or prejudice to the defendant.

## V

The defendant's second proposition of law concerns the refusal of the trial court to grant a continuance before trial in order to obtain expert psychiatric testimony. The defendant was arraigned on March 11, 1974. At that time, the defense, by motion, requested the appointment of experts for a psychiatric evaluation of the defendant, and urged that the order be issued immediately. The defense argued that it might take several weeks to get an appointment, and that it would be important to the defense to know as

soon as possible the mental condition of the defendant at the time of the killings. The trial judge then suggested that the attorneys consider the psychiatrists to be named so that they could be immediately contacted to see if they were available, informing counsel that the trial date would be before May 1, and that the trial would have priority over everything else on his calendar. The trial was eventually set to begin on April 22, and three psychiatrists were appointed. Their reports were filed with the court on April 1, although they apparently were not forwarded to defense counsel until April 12.

On April 16, six days before the date set for trial, the defense made a motion for a continuance in order to obtain further psychiatric evaluation. Apparently, defense counsel mistakenly believed that the three psychiatrists were appointed as witnesses of the court solely for the purpose of determining the defendant's capacity to stand trial, although the judge's instructions in letters to the examining psychiatrists asked that the defendant be examined with regard to both his competency to stand trial and his sanity at the time of the killings. The court denied the continuance and stated that, ''I will let you have any psychiatrist in the state of Ohio that you desire, if as you said, he can be here, he can examine him, that does not interfere with the processes of this trial.''

On April 19, a sanity hearing was held, and, at that hearing, the judge permitted extended examination into the defendant's mental condition at the time of the killings and requested one of the testifying psychiatrists to make himself available to further examine the defendant on behalf of the defense. The psychiatrist's report was submitted to the court and to defense counsel during the *voir dire* stage of jury selection. Later, the court also allowed a psychologist to administer psychological tests to the defendant. On April 29, one of the defense attorneys stated to the court that ''we asked for a continuance for the principle reason at that time to get psychiatric evaluation. Your Honor has assisted us greatly in getting psychiatric

evaluation. Probably can do that in time to prepare the defense * * *." None of the medical experts was of the opinion that the defendant had a mental illness or defect, or that he lacked the capacity to know the wrongfulness of his conduct, although the defense psychologist testified that, based upon the tests he had administered, the defendant lacked the emotional capacity to conform his conduct to the requirements of law. His opinion was that the defendant had sufficient intellectual ability to discriminate right from wrong, but was significantly deficient in conscience or in feelings of guilt and remorse for a wrongful act.

The defendant claims prejudicial error because the court's denial of a continuance prevented the defense from obtaining its own psychiatric experts. An examination of the record cited above discloses no such prejudice. The defense did not open its case until May 6th, 20 days after the denial of the continuance. The trial judge made clear that he was willing to permit examination during that time by any qualified expert in the state of Ohio, and two examinations were in fact carried out, one by a psychiatrist and one by a psychologist, although the defense did not make use of the psychiatrist's report nor did it call him as a witnesses. The defense also suggests that it lacked time to prepare its case adequately, but the trial did not begin until almost a month and a half after arraignment, and it is clear from the record that counsel for the defense performed their duties thoroughly, intelligently, and well. *State* v. *Price* (1973), 34 Ohio St. 2d 43, 295 N. E. 2d 669.

The granting of a continuance is generally a matter for the trial court's broad discretion, and the refusal of a continuance does not constitute grounds for reversal unless there has been an abuse of discretion. In this case, the continuance was requested in order to obtain psychiatric evidence only six days before the date set for trial, over a month after the arraignment, and after subpoenas had been sent out to the 150 members of the venire. The trial judge denied the continuance, but permitted the de-

fense to seek any additional psychiatric witnesses who could be obtained, and actively aided the defense in obtaining a psychiatrist. Those decisions were within the trial court's discretion and afforded a fair opportunity to the defense to obtain whatever expert testimony it needed. No prejudice to the defendant's rights appears and the second assignment of error is accordingly overruled.

## VI

Proposition of law number five claims error, first, in the trial court's refusal to modify the statutory order of trial so as to permit the defense to defer its opening statement until after the close of the case for the prosecution, and, second, in the prosecutor's comment during closing argument upon the defense's waiver of its opening statement.

R. C. 2945.10 sets out the order of the proceedings of criminal trial and states:

"The trial of an issue upon an indictment or information shall proceed before the trial court or jury as follows:

"(A) Counsel for the state must first state the case for the prosecution, and may briefly state the evidence by which he expects to sustain it.

"(B) The defendant or his counsel must then state his defense, and may briefly state the evidence which he expects to offer in support of it.

"  *  *  *

"The court may deviate from the order of proceedings listed in this section."

Any decision to vary the order of proceedings at trial is within the sound discretion of the trial judge, and any claim that a judge erred in following the statutorily mandated order of proceedings must sustain a heavy burden to demonstrate the unfairness and prejudice of following the statute. The defense did waive its opening statement following the denial of a request to defer its opening, but that of itself does not indicate any prejudice to the defendant. No showing of good cause was made at trial, and

no indication that the defendant was deprived of a fair trial appears from the record. *Webb* v. *State* (1876), 29 Ohio St. 351. The trial judge did not abuse his discretion in denying the defense request, and that branch of the fifth proposition of law is therefore overruled.

During closing argument, the assistant prosecutor made the following statement:

"And let's look at the case that the defendant has put on at this point. What is it? No opening statement. Sits back here, listens to the state of Ohio . . .

"Mr. Purnell: Object to that.

"Mr. Shoemaker: To hear what they have to say.

"Court: He may continue."

No further reference was made to the defense's waiver of opening statement.

Counsel are generally accorded wide latitude in closing argument, and limited comment upon the conduct of the defense is familiar and not improper. This comment was within reasonable bounds and we find no error arising therefrom.

### VII

The defendant's seventh proposition of law claims error in the admission of certain testimony concerning other acts by the defendant.

Mrs. Marian Smith testified for the prosecution that on February 22 (four days before the death of the Anthonys and two days before the defendant's eighteenth birthday), the defendant abducted her at gunpoint in a shopping center parking lot, robbed her, and locked her in the trunk before abandoning her car. This testimony would clearly be admissible under R. C. 2945.59, as tending to show a scheme, plan, or system of the defendant. *State* v. *Flonnory* (1972), 31 Ohio St. 2d 124, 285 N. E. 2d 726. The defense contends however that R. C. 2945.59 should be read *in pari materia* with R. C. 2151.358. That statute provides, in pertinent part, that:

"The judgment rendered by * * * [the Juvenile Court under R. C. Chapter 2151] shall not impose any of the

civil disabilities ordinarily imposed by conviction of a crime in that the child is not a criminal by reason of such adjudication, nor shall any child be charged or convicted of a crime in any court except as provided by this chapter. The disposition of a child under the judgment rendered or any evidence given in court is not admissible as evidence against the child in any other case or proceeding in any other court, except that the judgment rendered and the disposition of such child may be considered by any court only as to the matter of sentence or to the granting of probation. * * *"

The above language applies only to evidence given in Juvenile Court and dispositions by that court. There is no suggestion in this language that it was intended to bar the admission of any other evidence against an accused. This language is plain on its face and does not apply to Mrs. Smith's testimony, which was not a part of any juvenile proceeding. There was no error in admitting that testimony.

Error is also claimed in the admission of testimony, during cross-examination of defendant's grandmother, that defendant was involved in an earlier murder. The following colloquy occurred during direct examination:

"Q. I said you indicated that Carl lived with you from November up until he was arrested. Do you know where he lived prior to that time?

"A. Where he lived prior? What do you mean?

"Q. Where did he live before he came to live with you, do you know?

"A. He was in Columbus, I suppose."

The defense claims error in the subsequent cross-examination:

"Q. What was Lamont in Columbus for?

"MR. PURNELL: Object.

"COURT: Overruled. You may answer. Answer the question.

"A. Well, for murder.

"Q. When did that occur?

"MR. PURNELL: Object.

"COURT: You may answer. Overruled.

"A. I don't know. I forget what year.

"Q. Do you remember how old he was at that time?

"A. I think about 14."

The fact that the defendant had been involved in a juvenile murder was irrelevant and inadmissible as evidence. The Court of Appeals held that the defense had nevertheless opened the door to such testimony by asking where the defendant had lived. That holding is too broad. The prosecutor would not have been justified in inquiring as to the defendant's criminal record merely because the location of his commitment by the state was mentioned. The question actually asked was, however, ambiguous. The question "What was Lamont in Columbus for?" might naturally be taken to be an inquiry into what he was doing there, which was, apparently, attending school, a state school for boys under commitment by juvenile authorities. The defense had itself introduced evidence of the defendant's juvenile record in earlier cross-examination, although the particular crime was not mentioned. A limited inquiry into the defendant's activities in Columbus could properly have been made after the subject was broached by the defense, and from this record it is unclear whether the prosecutor was attempting by his question to introduce inadmissible evidence of a past conviction, evidence which was in fact elicited from the defense's witness. Rulings upon the admissibility of questions at trial are largely within the discretion of the trial judge. Here, the trial judge did not abuse his discretion in allowing the question to be put, even though inadmissible testimony was elicited, and we accordingly do not find error in the trial judge's ruling on this point.

Finally, the defendant claims error in the allowance, over objection, of certain questions on cross-examination of the defendant in regard to threats he allegedly made to sheriff's deputies while in custody, several days after his indictment for the Anthony slayings. The prosecution was

allowed to ask the defendant whether on one occasion the defendant had told a deputy "[t]hat he was a dead man when you got out: if you couldn't do it, your people would," and whether on another occasion the defendant had threatened a deputy by saying "you were going to kill him if you had to do it with your bare hands." The defendant denied having made either threat in those terms, although he admitted making angry statements, and the prosecution called the two deputies as rebuttal witnesses and was allowed, also over objection, to introduce testimony of the two deputies that the alleged threats were in fact made.

The allowance of the questions put to the defendant and of the rebuttal testimony was plainly error. Such testimony was irrelevant to any issue in the case and was not admissible under R. C. 2945.59. This issue was decided in *State* v. *Moore* (1948), 149 Ohio St. 226, 78 N. E. 2d 365, which considered the application of Ohio's "like acts or other acts" statute (at that time G. C. 13444-19), and held in paragraph two of the syllabus:

"In a prosecution for felonious homicide, testimony as to threats made by the defendant against a third person sometime prior to the killing, with which former incident the deceased had no connection and which formed no part of the affair in which the deceased was killed, is not, over objection, admissible in evidence against the defendant."

It is immaterial that in this case the threats were made subsequent to the killing.

We turn then to consider whether this error can be considered harmless, or whether it requires the reversal of the jury's verdict. Error in the admission of evidence is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction. In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *State* v. *Abrams* (1974), 39 Ohio St. 2d 53, 313 N. E. 2d 823; *State* v. *Crawford* (1972), 32 Ohio St. 2d 254, 291 N. E. 2d 450; *Chapman* v. *California* (1967), 386 U. S. 18; *Harrington* v. *California* (1969), 395 U. S. 250.

In this case, the rebuttal testimony tended to impeach the credibility of the defendant, although his own version of the threats and those of the rebuttal witnesses did not differ greatly. It also, at its worst, tended to portray the defendant as someone of violent and wanton temperament, and as one who might kill easily. The severity of such reflections upon the defendant's credibility and character, however, must be considered in relation to the other evidence in the case. The defendant admitted that he had lied repeatedly to the police, and his testimony was contradicted in numerous details by other witnesses. The mass of evidence in the case contradicted and impeached his testimony so thoroughly that the effect of the rebuttal testimony upon his credibility appears insignificant.

The rebuttal testimony also seems most unlikely to have contributed in any noticeable degree to portraying him as one for whom murder came easily. That was the picture of the defendant which the defense's psychologist attempted to establish—a picture of a young man lacking in conscience and in feelings of guilt or remorse, one who could hardly stop himself from killing. The defendant confessed on the stand to armed robbery, and claimed, as a sort of alibi, that he had intended only to help steal a car and rob a store. There was little that his angry threats to the deputies could further detract from the character thus portrayed by the defendant himself.

The evidence presented at trial is set out at some length at the beginning of this opinion and need not be repeated here. That evidence is overwhelming in its accusation of the defendant. He was found with the probable murder weapon, and with the car and other items taken from the murdered couple. He admitted and, indeed, bragged of committing the murders to several witnesses. One witness testified that he showed knowledge of the fact that the murdered woman had lived a few minutes after the shootings, knowledge that only the murderer could have. The defendant's account that Samuel Howze, Jr., was the killer is unlikely on its face. It differed from his own earlier statement, and it was thoroughly contradicted by the testi-

mony of other witnesses, including testimony that the defendant did not have the car which he claimed to be driving at the time. From the record in this case, we find no reasonable possibility that the erroneous rebuttal evidence might have contributed to the defendant's conviction, and find that the error committed was harmless beyond any reasonable doubt. The seventh proposition of law is overruled.

## VIII

During a part of the cross-examination of Samuel Howze, Jr., the trial judge ordered the courtroom cleared of all spectators except news media reporters. The reason for this was apparently to reassure the witness, who was worried about his safety, and to enable the defense to obtain an answer to the question of whether the witness had called the police and reported the killings. Earlier in the cross-examination, the witness's attorney had objected to that question, and the defense had withdrawn it after a bench conference which was out of the hearing of the court reporter and does not appear in the record. The defense then completed the remainder of its cross-examination and the trial judge ordered the courtroom cleared while the defense pursued this particular line of questioning. The judge stated in explanation that "[t]his is with consent of counsel—the prosecutor and defense counsel, in order to arrive at a particular answer; they can have the answer." No objection was raised by the defense, and defense counsel suggested to the court that a statement be made to members of the press to further insure the witness's safety. At the conclusion of the witness's testimony, the judge held a meeting in chambers with the press and opposing counsel. He stated for the record that the purpose of the meeting was to explain to reporters that the witness "was quite concerned about his safety in that he reviewed [sic] himself to the general public that he did inform on this defendant; that he was in fear of his life; that he, the witness and the witness alone felt this." The judge also stated that there had apparently been threats

made against the witness. The defense contends that the temporary closing of the courtroom violated the defendant's right to a public trial, and that this right was not waived by defense counsel's silence and failure to object.

The right to a public trial is guaranteed by both Section 10, Article I of the Ohio Constitution, and the Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment. *In re Oliver* (1948), 333 U. S. 257. As a matter of federal constitutional law, the right is considered to be waived if not raised by the defendant at an appropriate time. *Levine* v. *United States* (1960), 362 U. S. 610. Therefore, the question in this case is whether the judge's order constituted a denial of defendant's rights under the Ohio Constitution.

The apparent basis for the exclusion of spectators during part of the witness's testimony was that the witness feared for his life because of alleged threats made against him. It has been frequently held that the trial judge is responsible for the conduct of a trial and has discretion to issue reasonable orders excluding spectators in order to protect or to prevent intimidation of a witness. *United States, ex rel. Bruno,* v. *Herold* (1969), 408 F. 2d 125; *People* v. *Hagan* (1969), 24 N. Y. 2d 395, 248 N. E. 2d 588, certiorari denied, 396 U. S. 886; *People* v. *Hinton* (1972), 31 N. Y. 2d 71, 286 N. E. 2d 265, certiorari denied, 410 U. S. 911. See, also, *People* v. *Santo* (1954), 43 Cal. 2d 319, 273 P. 2d 249, certiorari denied in *Graham* v. *California*, 348 U. S. 959; *Pierpont* v. *State* (1934), 49 Ohio App. 77, 195 N. E. 264 (petition in error dismissed); 128 Ohio St. 572, 192 N. E. 740; *Makley* v. *State* (1934), 49 Ohio App. 359, 197 N. E. 339. A reasonable and necessary order for this purpose is not a denial of the right to a public trial. The difficulty which the present case poses is that little appears in the record which aids us in determining whether this order was in fact reasonable and necessary. The right of a public trial is a fundamental one, and should be abridged only out of clear necessity. The record here provides only hints that the wit-

ness feared threats made out of court, suggests only inferentially that he was intimidated or endangered by those threats, and does not indicate whether some less restrictive order, limited for example to particular spectators in the courtroom, might have sufficed. These matters may well have been considered by the court in the sidebar conference which does not appear in this record, but we are reluctant to·hold that an order restricting so fundamental a right as that of a public trial could be justified by as scanty a record as that before us.

The circumstances of this case, however, convince us that whatever error there might have been in this case, it was not prejudicial to the defendant and was effectively waived. The order of the trial judge in this case was made in the course of defense cross-examination, in order to permit the defense to pursue a line of questioning to which the witness's counsel objected. It appears likely that this order was primarily for the benefit of the defense, to enable it to obtain answers which the witness would otherwise have refused to give. Further, when the judge stated that the order was by agreement of both the prosecutor and defense counsel, the defense not only failed to correct the judge or to suggest any lack of agreement, but on two occasions suggested ways of more effectually protecting the safety of the witness. Such circumstances dispel any reasonable claim of prejudice to this defendant and strongly indicate that this order was made for the benefit of the defense and with its active support.

This court held in *State* v. *Hensley* (1906), 75 Ohio St. 255, 266, 79 N. E. 462, that an exclusion order which is too general in character, and which is too restrictive in its limitation of admissions, is violative of the right to a public trial and is not waived by silence. We think, however, that the principle stated by the court cannot apply to this case. An order which is primarily for the benefit of the defendant, and which the judge stated, without contradiction, to have been made with the consent of counsel, stands on a very different footing from one which was merely not

objected to. It comes near to being an order on the defendant's own motion. Where no prejudice is indicated, we think that no claim for reversal of the verdict may justly be founded on that order. As Mr. Justice Frankfurter said in *Levine* v. *United States, supra* (1960), 362 U. S. 610, 619: "* * * Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no disregard of a right, but raises an abstract claim only as an afterthought on appeal."

The defendant's eighth assignment of error is overruled.

## IX

The defense claims error in several rulings on evidence in his ninth proposition of law.

The prosecution's ballistic expert testified that the bullets which killed the Anthonys were so mutilated that he could not determine whether they were fired by the gun taken from the defendant. But he also testified that the bullets were fired by a gun having similar characteristics, and that the bullets were also similar in various physical characteristics to bullets found in the defendant's gun. This was proper and admissible evidence. Defendant relies largely on the case of *State* v. *Holt* (1969), 17 Ohio St. 2d 81, 246 N. E. 2d 365, in which an expert witness was permitted to give an opinion that two hair samples were similar and likely to be from the same source, rather than that they were reasonably certain to be from the same source. That case is not in point. The ballistics expert in this case testified only as to observable characteristics of the bullets in evidence, and as to findings which could be made with reasonable scientific certainty. He did not stray into giving any opinion as to the possibility or likelihood that the death bullets were fired by the defendant's gun, the sort of testimony which was held to be error in *Holt*.

The defense makes a similar objection with regard to

certain expert psychological testimony framed to elicit "potential" or "possible" explanations of the defendant's mental state, but the questions objected to were all during cross-examination and were within the proper scope of that examination. Other minor objections to parts of the psychiatric and psychological testimony at the trial and the mitigation hearing also are not well-founded.

Finally, the defense contends that the judge erred in not recalling Samuel Howze, Jr., a prosecution witness, after an *in camera* inspection of prior recorded statements pursuant to Crim. R. 16 disclosed a claimed inconsistency. The defense claim was not raised until after the defense had finished its cross-examination, but the judge nevertheless examined the witness's prior statement and his testimony and found no inconsistency to exist. That finding is justified by the record, although the prior statement was somewhat ambiguous, and the defendant's claim of error is therefore not well taken.

We find no error in the matters raised by the defense's ninth proposition of law, and that proposition is accordingly overruled.

## X

No error prejudicial to the defendant having been found, the judgment of the Court of Appeals is affirmed.

*Judgment affirmed.*

Corrigan, Celebrezze and W. Brown, JJ., concur.

O'Neill, C. J., Herbert and P. Brown, JJ., concur separately.

Herbert, J., concurring. I concur in the opinion, except for that portion which purports to judicially interpret the meaning and application of R. C. 2929.04(B)(3).

O'Neill, C. J., and P. Brown, J., concur in the foregoing concurring opinion.