[Cite as *State v. Belcher*, 2013-Ohio-1234.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO

       Plaintiff-Appellee

v.

JESSICA L. BELCHER


       Defendant-Appellant



Appellate Case No.    24968

Trial Court Case No.   11-CRB-1273

(Criminal Appeal from
 Municipal Court)

. . . . . . . . . . .

O P I N I O N

Rendered on the 29th day of March, 2013.

. . . . . . . . . . .

JOHN J. DANISH, Atty. Reg. No. 0046639, City Attorney, STEPHANIE L. COOK,  Atty. Reg. No. 0067101, Chief Prosecutor, by TROY B. DANIELS, Atty. Reg. No. 0084957, Assistant City Prosecutor, Dayton City Prosecutor's Office, 335 West Third Street, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

TINA M. MCFALL, Atty. Reg. No. 0082586, Assistant Public Defender, Law Office of the Public

Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
  Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1}    Defendant-Appellant, Jessica Belcher, appeals from her conviction and sentence on two counts of Assault, following a jury trial.   Belcher contends that the trial court abused its discretion by refusing to admit evidence of various policies and procedures of the hospital where the assault took place.   Belcher also contends that the jury's verdict was against the manifest weight of the evidence.

{¶ 2}    In addition, Belcher maintains that her constitutional right to a public trial was violated when the trial court scheduled trial on Saturday, that her constitutional right of confrontation was denied, and that error occurred when the trial court refused to instruct the jury on self-defense and defense of others.   Finally, Belcher argues that the cumulative effect of the first five errors denied her of due process rights to a fair trial.

{¶ 3}    We conclude that the trial court did not abuse its discretion in refusing to admit evidence pertaining to hospital policies and procedures, because the evidence was not relevant. The jury verdict was also not against the manifest weight of the evidence.

{¶ 4}    We further conclude that the court did not violate Belcher's constitutional rights by holding court on Saturday, nor did the court deny Belcher's right of confrontation.   In addition, the court correctly refused to instruct the jury on self-defense and defense of others, as Belcher failed to introduce sufficient evidence, which, if believed, would raise a question in the minds of reasonable persons concerning the existence of these issues.   Finally, there was no error, so there could be no cumulative error.   Accordingly, the judgment of the trial court is

affirmed.

## I. Facts and Course of Proceedings

**{¶ 5}** The charges against Jessica Belcher arose from a melee that occurred in the Emergency Room of Miami Valley Hospital (MVH) in the early morning hours of February 19, 2011. Belcher's friend, Matthew Wiley, had been the victim of an assault that evening, and had sought medical treatment at MVH. Dr. Reynolds, an emergency room doctor, saw Wiley at about 2:17 a.m., and decided that Wiley needed a CAT scan. Wiley had areas of swelling around his eyes and some lacerations to the forehead and brow. Because Reynolds suspected that Wiley was intoxicated, he also ordered an alcohol screen, which showed that Wiley had a blood alcohol level between .18 and .19. Clinically, Wiley would have been considered intoxicated.

**{¶ 6}** A CAT scan was performed, per Reynolds' instructions. Subsequently, MVH nurse, Julie Wooddell, came into Wiley's room. Belcher and another friend, Michelle Wells, were also in the room, visiting with Wiley.

**{¶ 7}** Wooddell was the nurse assigned to Wiley, but she had been at lunch when Wiley arrived. Wooddell returned from lunch between 2:30 a.m. and 2:40 a.m., checked the computer, and learned that she had a new patient, Wiley, in Room 32. Wooddell went to Room 32 and introduced herself. She observed that Wiley had injuries above his right eye and had a cut with some bleeding. When Wooddell entered the room, Wiley got up out of the bed and was stumbling around the side of the bed. Wiley was pacing around a bit and said he had to "pee." Wooddell helped him back to bed because he was very unsteady. Wooddell concluded that

Wiley was under the influence of alcohol because of his unsteady gait and the constriction of his pupils. She also could smell a fairly strong odor of alcohol. Wooddell told Wiley that he needed to get back in bed for his safety.

{¶ 8} The nearest restroom was some distance from Room 32, and Wooddell was worried that Wiley would injure himself if he walked that distance. Accordingly, she offered Wiley a disposable urinal that is kept in patient rooms. Wiley took the urinal and threw it back at Wooddell, raising his voice and appearing to become more agitated. The visitors were also egging Wiley on, stating that he could get up and use the bathroom himself and that they would help him. After Wiley threw the urinal at Wooddell, he said he would wait a bit. Wooddell finished her assessment, noticing that the women with Wiley also smelled of alcohol and were a bit unsteady on their feet.

{¶ 9} After Wooddell finished the assessment, Wiley said that he had to pee really bad. When Wooddell gave him another urinal, he ripped it out of her hands and threw it up towards her chest. Wiley was raising his voice, saying he was not a child. Wooddell was in the process of stepping out to get someone else because she no longer felt safe in the room after Wiley had thrown the urinal at her twice. Just then, however, another nurse, Shane McDermott, stepped into the room.

{¶ 10} McDermott had been at lunch and was at the nurses' station logging in when he heard a lot of yelling, screaming, and cursing going on in Room 32, which was across from the nurses' station. McDermott also heard something being thrown in Room 32. McDermott asked the unit coordinator to call security and went to Room 32. He saw Wooddell, a patient, and two visitors in the room. The patient and one of the female visitors, identified as Belcher, were

yelling and screaming. Wooddell was to the left of the bed getting the urinal off the floor. McDermott asked Wooddell what was going on, and she told him that the patient had to pee and wanted to get up, but that she would not let him get up to use the restroom because he was intoxicated.

{¶ 11} McDermott told Belcher that they were not going to let Wiley up to go the bathroom because he was intoxicated, had obviously been in a fight, and had a head injury. At that point, Belcher was screaming and saying things like, "[Y]ou don't treat him like an f***ing dog, you can't treat him like a f***ing dog, he can go." Trial Transcript, Volume 4, p. 517.

{¶ 12} The agitation in the room was already at a very high level and increased even more when McDermott came in. Wiley had mentioned three or four times that he wanted to leave the hospital, but Wooddell had told him that he could not leave because he was intoxicated.

{¶ 13} During these events, MVH emergency technician, Beth Bachmann, was standing outside Room 32, watching. Bachmann's attention had been drawn by the loud talking and cursing of the two visitors. In addition, Wiley was intoxicated, loud, and belligerent, and was cursing loudly. Bachmann stood outside for a minute to see if the nurses would need an extra pair of hands.

{¶ 14} Kasey Koeser, another MVH emergency technician, was in the area of the nursing station. Her attention was directed towards Room 32 because she heard the patient screaming and also heard the charge nurse, Marlene Hey, calling for campus police to come to bedside. Koeser saw the patient sitting on the bed, and also saw that two female visitors and two nurses were in the room. Koeser testified that McDermott was attempting to defuse the situation and get the patient to urinate in the urinal, but was not successful.

{¶ 15}    Wooddell, McDermott, Bachmann, and Koeser all testified that Wiley suddenly jumped out of the bed, swinging or flailing his arms at McDermott.  According to McDermott, he did not know if Wiley was swinging or trying to shove him out of the way, but Wiley's arm was coming at him with a closed fist, so he moved to the side.  Wiley then jumped off the bed and took a swing, and McDermott stepped aside.  Wiley  pushed a cart with his arm and came out of the room to where the charge nurse was standing, looking shocked because a man was coming into the hallway out of control.

{¶ 16}    McDermott testified that he followed Wiley out of the room because Wiley was coming out with his arms flailing.  It was then that McDermott grabbed Wiley by the wrist. According to Koeser, Wiley tried to hit McDermott at least three times after McDermott grabbed his wrist, and McDermott then put Wiley's face against the wall between Rooms 32 and 34. Wiley tried to get away, and both McDermott and Wiley ended up on the floor.   McDermott was unsure how they got on the ground and thought their legs may have become tangled.   Once they were on the ground, McDermott intentionally held Wiley there.   While they were on the ground, Wiley tried to elbow, punch, and kick McDermott.   McDermott was trying to use his body weight to hold Wiley down.   McDermott was able to get Wiley's upper body under control, but Wiley's legs were still kicking.  Eventually, an orthopedic technician, Mark Huss, came over and sat on Wiley's legs.   After Huss got on Wiley's legs, Wiley was bending his knees up, trying to kick Huss.

{¶ 17}    While these events were happening, the two female visitors, Belcher and Wells, had poked their heads out of the room to ask what was going on.  McDermott had his back to them, struggling with Wiley on the floor.  Belcher then came out of the room, yelling and

heading toward McDermott. Belcher was saying, "Get off of him. Leave him alone. Don't touch him." Trial Transcript, Volume 2, p. 295 (referring to leaving Wiley alone). Bachmann told Belcher and Wells that she needed to take Belcher and Wells to the waiting room, and that they could not be in the patient area any longer. Bachmann said this because the combination of drunk patients and drunk visitors is problematic; they feed off each other. If one gets agitated, the others do as well. Based on Belcher's slurred speech and behavior, Bachmann believed that Belcher was intoxicated.

{¶ 18} Bachmann stepped in front of Belcher to try and stop her from going to where McDermott and Wiley were struggling. However, Belcher grabbed Bachmann and pushed her. Bachmann went backwards, fell, and slid about three feet across the floor in a direction away from where the men were struggling. Belcher went down to the ground with Bachmann, landing beside or on top of Bachmann.

{¶ 19} Koeser was also standing outside Room 32 and saw Belcher push Bachmann. Koeser grabbed Belcher by the back of her jeans and lifted her off Bachmann. At this point, Belcher was yelling and cussing, saying, "Get the f*ck off him, you are hurting him." Trial Transcript, Volume 3, p. 364 (referring again to Wiley.)

{¶ 20} Koeser made Belcher stand up. She still had Belcher by the pants and pushed or helped Belcher back to Room 32. During this time, Belcher continued to struggle with Koeser. When they got into the room, Koeser placed Belcher up against the wall. At this point, Belcher had her fist clenched, was pivoting back and forth, and was trying to hit Koeser. Belcher swung at Koeser at least three times. Koeser could not recall if Belcher was actually successful in striking her, but two eye-witnesses (Bachmann and Tonya Wetzell, another MVH

emergency technician) both testified to having seen Belcher hit Koeser.

{¶ 21}     At this point, the campus police arrived and took Belcher out of the room, to the MVH dispatch center.   Koeser realized she had injuries when she stepped out of the room.   Her right ear was hot and she had blood on her fingers after she felt her ear.   Koeser did not previously have an injury to her ear.

{¶ 22}     In the meantime, out in the hallway, Wiley had continued to struggle with McDermott and Huss until security arrived.   Wooddell then noticed that Wiley was not breathing and told McDermott and Huss to get off.   Wooddell went to Wiley's head and held it in a C-spine position so that they could turn him over and see what was going on. There was also a decent amount of blood on the floor, from Wiley's cut, which had apparently reopened.

{¶ 23}     Wooddell asked Dr. Reynolds to come and look at Wiley.   When Dr. Reynolds came over, Wiley was unconscious.   Wiley was then lifted onto a cot and was taken into Room 36, which was a trauma bay.   When Dr. Reynolds checked Wiley about thirty seconds later, Wiley had a pulse and was breathing.   Wiley was placed in a hard cervical collar and was also given oxygen.   He was then given a second CAT scan, which indicated that he had not sustained any additional injuries.   Wiley was eventually returned to Room 32, and apologized for attacking the nurses and getting out of bed.

{¶ 24}     After the incident occurred, MVH campus police called the Dayton Police Department, which dispatched Detective William Jones.   When Jones arrived at the MVH dispatch center shortly after 3:00 a.m., Belcher was sitting handcuffed in an open area.   MVH Sergeant Van Dohre told Jones what had happened.   Jones then spoke with Belcher, explained that she was being charged with assault, and administered *Miranda* warnings.   According to

Jones, Belcher apologized for assaulting the nurses, and said that the incident had gotten out of hand and was an accident. Belcher did not specify whom she had assaulted, and she was not crying or upset. Jones arranged for another crew to transport Belcher to jail, and then went on to speak with the nurses and the doctor. Jones spoke to McDermott, Bachmann, and Koeser, and arranged for all the witnesses to make written statements.

**{¶ 25}** Belcher was subsequently charged with two counts of first-degree misdemeanor Assault in Dayton Municipal Court. After several continuances were granted, the case was tried to a jury beginning on Thursday, October 27, 2011, and concluding on Saturday, October 29, 2011. Belcher was found guilty on both counts and was sentenced to 180 days jail on each count. She was given one day of jail credit, with 179 days suspended, and was sentenced to two years of basic supervision. In addition, Belcher was required to pay court costs and fines and was required to complete anger management and alcohol treatment. Belcher appeals from her conviction and sentence.

## II. Did the Trial Court Err in Refusing to Admit Evidence of MVH Policies and Procedures?

**{¶ 26}** Belcher's First Assignment of Error states that:

The trial court abused its discretion when it barred the defendant from offering evidence of Miami Valley Hospital[']s policies and procedures and CPI training compliance.

**{¶ 27}** Under this assignment of error, Belcher contends that the trial court erred in refusing to admit evidence pertaining to the compliance of witnesses with MVH's policies and

procedures, and with Crisis Prevention Institute's non-violent crisis prevention intervention (CPI) training. Belcher maintains that this evidence was relevant to show witness bias and to establish that the injury was caused by poorly-trained employees who used non-approved restraint techniques. Belcher further argues that Wiley and Belcher were not "first aggressors." Rather, she claims that McDermott was the first aggressor when he improperly restrained Belcher to the floor using deadly force.

{¶ 28} The State filed a motion in limine prior to trial, asking the court to exclude evidence pertaining to any witness's compliance with MVH policies or with CPI training. According to the State, CPI training standards are irrelevant and would also be confusing to the jury, because they hold people to higher standards than anyone else would be required to observe in an assault situation. In response, Belcher argued that if the result of the positions in which Wiley was placed can be fatal, Wiley had a right to defend against that deadly force, and Belcher had a right to defend Wiley. Belcher also argued that if Wiley had a right to leave the hospital pursuant to its policy about leaving against medical advice, MVH employees had no right to stop him by placing him in a position that could cause his death. The court found these policies irrelevant and sustained the motion in limine. During the trial, Belcher was allowed to question the MVH employee witnesses about whether they had taken CPI training. The court did not permit further questions on the CPI training, but did allow Belcher to make proffers about the excluded evidence.

{¶ 29} To evaluate this argument, we start with the general proposition that "[a] trial court has broad discretion in determining whether to admit or exclude evidence. Absent an abuse of discretion that materially prejudices a party, the trial court's decision will stand."

*Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991), citing *State v. Withers* 44 Ohio St.2d 53, 55, 337 N.E.2d 780 (1975). An abuse of discretion occurs when a trial court "makes a decision that is unreasonable, arbitrary, or unconscionable." *Huntington Natl. Bank v. Burch*, 157 Ohio App.3d 71, 2004-Ohio-2046, 809 N.E.2d 55, ¶ 14 (2d Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 30}    Evid.R. 402 provides that "[a]ll relevant evidence is admissible * * * [and that] [e]vidence which is not relevant is not admissible." Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

{¶ 31}    The initial facts in this case that are of consequence relate to whether Belcher is guilty of having assaulted both Beth Bachmann and Kasey Koeser in violation of R.C. 2903.13(A). That section of R.C. 2903.13 states that "No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn."

{¶ 32}    In order to establish guilt, the State was required to prove each element of these offenses beyond a reasonable doubt. R.C. 2905.01(A). In other words, the State had to prove beyond a reasonable doubt that Belcher knowingly caused or attempted to cause physical harm to Bachmann. The same elements would have to be established beyond a reasonable doubt with respect to Koeser. Whether Bachmann or Koeser, or others, violated a policy of either Miami Valley Hospital or their CPI training is irrelevant to the issue of whether Belcher knowingly caused or attempted to cause these individuals physical harm. As a result, the evidence would not be admissible in connection with these facts.

{¶ 33}   At trial, Belcher also raised the issues of self-defense and defense of others, which are affirmative defenses.   *See, e.g.*, *State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990) (self-defense), and *State v. Kleekamp*, 2d Dist. Montgomery No. 23533, 2010-Ohio-1906, ¶ 51, citing *State v. Moss*, 10th Dist. Franklin No. 05AP-610, 2006-Ohio-1647 (defense of others).   Therefore, facts of consequence to these defenses would be relevant.

{¶ 34}   " 'To establish self-defense for the use of less than deadly force in defense of one's person, the defendant must prove: (1) he was not at fault in creating the situation which gave rise to the event in which the use of non-deadly force occurred; (2) he had honest and reasonable grounds to believe that such conduct was necessary to defend himself against the imminent use of unlawful force; and (3) the force used was not likely to cause death or great bodily harm.' "   *State v. Hamrick*, 9th Dist. Lorain No. 09CA009628,  2010-Ohio-3796, ¶ 13, quoting *State v. Tanner*, 9th Dist. Medina No. 3258-M, 2002-Ohio-2662, ¶ 21.

{¶ 35}   "Defense of another is a variation of self-defense. Under certain circumstances, one may employ appropriate force to defend another individual against an assault.   However, 'one who intervenes to help a stranger stands in the shoes of the person whom he is aiding, and if the person aided is the one at fault, then the intervenor is not justified in his use of force and is guilty of an assault.'   * * *   Therefore, one who claims the lawful right to act in defense of another must meet the criteria for the affirmative defense of self-defense."   *Moss*, 10th Dist. Franklin No. 05AP-610, 2006-Ohio-1647, ¶ 13, citing *State v. Wenger,* 58 Ohio St.2d 336, 340, 390 N.E.2d 801 (1979).   *Accord*, *State v. Turner*, 2d Dist. Montgomery No. 24322, 2011-Ohio-5417, ¶ 13.

{¶ 36}   "The burden of going forward with the evidence of an affirmative defense, and

the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused." R.C. 2905.01(A). Furthermore, "an affirmative defense is one that can coexist with the State's satisfaction of its burden of proving each and every element of an offense beyond a reasonable doubt." *State v. Gilliam*, 2d Dist. Montgomery No. 17491, 1999 WL 812335, * 7 (Sept. 30, 1999).

{¶ 37} Under Belcher's theory of the case, Wiley was attempting to leave the hospital when he left Room 32, which he had a right to do pursuant to policies regarding leaving hospitals against medical advice. Thus, MVH employees had no right to stop Wiley by putting him in a position that could cause his death, as shown by the CPI manual. If MVH employees choose to do so, Wiley had a right of self-defense, and Belcher had a corresponding right to defend him.

{¶ 38} At trial, Belcher proffered Defense Ex. B, which contains guidelines pertaining to patients leaving the hospital against medical advice (AMA). The policy allows competent adult patients to end treatment and leave even if doing so is AMA. The policy states that:

> A patient may not be detained against his will in the presence of the following
>
> criteria:
>
> a. Alert and oriented to person, place, and time.
>
> b. Understanding of diagnosis.
>
> c. Comprehension of risks related to refusing treatment. Proffered Defense Ex.
>
> B., p. 1.

{¶ 39} In addition, the policy indicates that a physician will make the determination of a patient's competency. Other procedures are detailed in the policy, such as the need to explain the risks to health and alternatives to treatment; the need to at least attempt to have the patient

sign an AMA form; what documentation should be completed about the patient's physical condition; and the removal of items like catheters. The policy also states that a staff member should escort the patient to the hospital exit. *Id.* at pp. 1-2.

{¶ 40} When questioned about this issue on proffer, Wooddell, the attending nurse, stated that Wiley was oriented to person, time, and place. However, based on Wiley's speech and some of the things he was saying, Wiley was not capable of making the decision to leave AMA. Wooddell also said that the person who makes that decision is the physician. However, the situation escalated quickly before she had a chance to ask Dr. Reynolds about the issue.

{¶ 41} Under the circumstances of this case, the AMA policy is not relevant. Even if Wiley had a right to leave the hospital, his conduct was not consistent with the policy, which contemplates an orderly process of having a physician decide if the injured party is competent to make such decisions, following certain checkout procedures, and having a staff member escort the patient to the hospital exit. Instead, Wiley caused a disturbance with loud and belligerent behavior, leaped from bed while trying to assault a nurse, and then ran out into the hallway with his arms swinging, causing a possibility of injuring other staff, patients, or personnel.

{¶ 42} The CPI manual was submitted as Proffered Defense Ex. C, and was discussed during Wooddell's proffer examination. A variety of subjects are covered in the manual, including ways to identify behavior levels that contribute to development of crises, and how to attempt to de-escalate aggressive behavior. All MVH emergency room employees are required to take a CPI course and must be re-certified each year. The employees on duty the night of the incident had all taken the course.

{¶ 43} In addition, the CPI manual for the course discusses restraint. In particular, the

manual states that:

> Any physical intervention should be used only when all other options have been exhausted and when an individual is a danger to self or others. Even in those moments, an assessment is still necessary to determine the best course of action to maintain the *Care, Welfare, Safety, and Security*<sup>SM</sup> of all.

> * * *

> Remember that there are risks involved in any physical intervention. Therefore, they should always be considered when the danger presented by the acting-out individual outweighs the risks of physical intervention. Proffered Defense Ex. C, p. 12s. (Emphasis sic.)

{¶ 44} After outlining the risks of restraint, the CPI manual states that "[f]or these reasons and others, restraints should be used only when a person's behavior is MORE dangerous than the danger of using restraints." *Id.* (Emphasis sic.) The CPI manual further states that:

> Some restraints are more dangerous than others. For example, facedown (prone) floor restraints and positions in which a person is bent over in such a way that it is difficult to breathe are extremely dangerous. * * *

> *Restraint-related positional asphyxia* occurs when the person being restrained is placed in a position in which he cannot breathe properly and is not able to take in enough oxygen. Death can result from this lack of oxygen and consequent disturbance in the rhythm of the heart. *Id.* (Emphasis sic.)

{¶ 45} Wooddell testified during her proffer examination that CPI techniques were attempted with Wiley, such as McDermott stepping aside so that Wiley could get out of the room

without an injury occurring. However, at that point, no nonviolent technique would work because Wiley was "storming out in the hall" and had to be restrained for the safety of others. Trial Transcript, Volume 2, p. 272. Both Wooddell and Mark Huss, who was also examined on proffer, indicated that high-risks restraints for positional asphyxia occur when an individual is prone and others sit on his or her chest and legs. *Id.* at p. 273 and Trial Transcript, Volume 4, pp. 564-565.

**{¶ 46}** After reviewing the above facts, we conclude that the proffered testimony and the CPI manual are irrelevant to facts of consequence to the elements of self-defense. As was noted, self-defense requires that a defendant is not at fault in creating the situation that gives rise to the event causing the use of the defendant's non-deadly force. *Hamrick*, 9th Dist. Lorain No. 09CA009628, 2010-Ohio-3796, at ¶ 13.

**{¶ 47}** Self-defense does not apply in the case before us, because Wiley was at fault in creating the situation. For the same reason, defense of others also does not apply. "A person who uses force in defense of others 'stands in the shoes' of the person he or she is defending. This rule means that the intervenor 'acts at his own peril if the person assisted was in the wrong.' If the person being defended had no right to self-defense, the intervenor is not entitled to use force to defend that person, and cannot prevail on a 'defense of others' defense." *State v. Abalos*, 6th Dist. Lucas No. L–09–1280, 2011-Ohio-3489, ¶ 14, quoting *State v. Wenger*, 58 Ohio St.2d 336, 339 and 340, 390 N.E.2d 801 (1979). *Accord*, *State v. Turner*, 2d Dist. Montgomery No. 24322, 2011-Ohio-5417, ¶ 13.

**{¶ 48}** Accordingly, the trial court did not abuse its discretion in refusing to admit evidence regarding the AMA policy and the CPI manual. Belcher makes the further argument

that she should have been permitted to question employees about the possibility of civil liability on MVH's part if they failed to follow these policies, because it bears on the bias of the witnesses. In this regard, Belcher relies on *State v. Ferguson*, 5 Ohio St.3d 160, 165, 450 N.E.2d 265 (1983), which held that a trial court had erred when it refused to let the victim be cross-examined about her consultation with a law firm. The consultation concerned a potential civil action against the defendant's former employer. *Id.* at 165. *Ferguson* involves a different situation and is not pertinent to the case before us, as there was no evidence in the record that Wiley or Belcher had filed or had even contemplated filing a civil lawsuit against the hospital. Evid.R. 611(B), which is mentioned in *Ferguson*, does state that "[c]ross-examination shall be permitted on all relevant matters and matters affecting credibility."

{¶ 49}  As was noted, the CPI policies and AMA polices were not relevant to the facts at issue. Defense counsel was permitted to inquire about a meeting that some witnesses had with the hospital's legal department (which was described as a "debriefing" occurring immediately after the incident). Defense counsel also elicited testimony indicating that employees are required to follow hospital procedures, that employees have a sense of loyalty to their team members, and that employees have a duty to provide a safe environment for staff, patients, and visitors. Thus, to the extent that defense counsel wished to comment in closing argument about the potential for witness bias, there was evidence in the record from which this could have been done. The trial court did not act unreasonably, arbitrarily, or unconscionably in refusing to permit further inquiry on such a collateral matter.

{¶ 50}  Assuming for the sake of argument that the trial court committed any error in limiting matters bearing on the bias of witnesses as employees, the error was harmless beyond a

reasonable doubt. "Error in the admission of evidence is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction. In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt." *State v. Bayless*, 48 Ohio St.2d 73, 106-107, 357 N.E.2d 1035 (1976), vacated in part on other grounds, 438 U.S. 911, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978), citing *State v. Abrams*, 39 Ohio St.2d 53, 313 N.E.2d 823 (1974); *State v. Crawford*, 32 Ohio St.2d 254, 291 N.E.2d 450 (1972); *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

**{¶ 51}** Even if we were to find error in failure to admit evidence of employee bias (which we do not), there is no reasonable possibility that the omitted evidence would have impacted Belcher's conviction; the evidence of her guilt is overwhelming.

**{¶ 52}** Accordingly, the First Assignment of Error is overruled.

### III. Was the Conviction Against the Manifest Weight of the Evidence?

**{¶ 53}** Belcher's Second Assignment of Error states as follows:

The conviction of 2 counts of assault was against the manifest weight of the evidence.

**{¶ 54}** Under this assignment of error, Belcher contends that her convictions are against the manifest weight of the evidence because the State failed to prove that her actions were knowingly done with an intent to attempt to cause harm by punching Koeser in the ear or by shoving Bachmann to the floor. In this regard, Belcher first argues that she accidentally collided with Bachmann while attempting to see what was happening to Wiley. Belcher also maintains

that Koeser did not remember being punched in the ear and that the two other witnesses were not in a position to see what had happened. Finally, Belcher points out that the witnesses attended a meeting with the legal department at MVH, although she stops short of saying that the witnesses were told what to say.

{¶ 55} "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 56} We have reviewed the entire record and find no basis upon which to conclude that the trier of fact clearly lost its way and created a manifest miscarriage of justice. There is no evidence that the assault on Bachmann was accidental; all the witnesses who testified about this particular incident (Bachmann, Koeser, and Wetzell) indicated that Belcher grabbed and pushed Bachmann, causing her to fall to the floor. In addition, the witnesses who testified about the assault on Koeser (Bachmann and Wetzell) both stated that they saw Belcher punch Koeser. Furthermore, even though Koeser stated that she did not remember being punched, she also said that she concluded immediately after the incident that she had been struck. This was based on

the fact that her ear was very hot, and she had blood on her fingers after she touched her ear.

{¶ 57}   As an additional matter, R.C. 2903.13(A) does not require that a defendant cause physical harm; it also prohibits individuals from attempting to cause physical harm to another.   The testimony from the victim, Koeser, is that Belcher was attempting to hit her, and swung at her at least three times.   This testimony alone, would have satisfied the requirements for a conviction on the assault charge.

{¶ 58}   Regarding Belcher's third point about the "meeting" with the legal department, the evidence is otherwise than what Belcher implies.   There is no evidence that witnesses were told what to say, nor is there evidence that anything nefarious occurred in the meeting.   The one witness who was specifically questioned on this point stated that when she filled out her witness statement, she was not told to say what other people had said happened.   Instead, she was told to say what *did* happen.   We also note that the individuals in the hospital worked together on a daily or weekly basis.   It would be unusual if they failed to talk with each other about what had happened.

{¶ 59}   Based on the preceding discussion, the Second Assignment of Error is overruled.


IV.   Was Defendant Deprived of a Public Trial?

{¶ 60}   Belcher's Third Assignment of Error is as follows:

The court scheduling a Saturday trial day denied the Defendant her constitutional right to a public trial.

{¶ 61}   Belcher contends under this assignment of error that she was deprived of the

right to a public trial because her case had to be presented on a Saturday, when the courthouse was closed to the public. Belcher argues that this was fundamentally unfair for three reasons: (1) the public was not able to attend; (2) the jury may have been prejudiced against her because they had to attend trial on a weekend; and (3) she was unable to subpoena Detective Jones into court to testify on her behalf because the clerk's office was closed for the weekend.

{¶ 62} In *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, the Supreme Court of Ohio noted that:

> The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. See *State v. Lane* (1979), 60 Ohio St.2d 112, 119, 14 O.O.3d 342, 397 N.E.2d 1338. This guarantee is a "cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances." *Id*.
>
> The violation of the right to a public trial is considered structural error and not subject to harmless-error analysis. *Waller v. Georgia* (1984), 467 U.S. 39, 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31, fn. 9; *Johnson v. United States* (1997), 520 U.S. 461, 468–469, 117 S.Ct. 1544, 137 L.Ed.2d 718. A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302. *Drummond* at ¶ 49-50.

{¶ 63} In *Drummond*, the Supreme Court of Ohio also held that counsel's failure to object to the closing of a courtroom constituted a waiver of the right to a public trial.

*Drummond* at ¶ 59. The record in the case before us indicates that Belcher knew well in advance of trial that the trial was expected to last three days, and also knew that if the trial lasted three days, the third trial day would be on Saturday. See Amended Trial Transcript, p. 15 (September 23, 2011 Hearing on Final Pre-Trial and Motion in Limine). Despite knowing that trial could be held on Saturday, Belcher failed to object. In addition, the State and Belcher both mentioned to the jury during voir dire that trial could be held on Saturday. Trial Transcript, Volume 1, pp. 69 and 105. Again, Belcher failed to object or to discuss the matter with the court.

**{¶ 64}** In view of these facts, we would normally conclude that Belcher waived the right to challenge the trial court's action by failing to object. After *Drummond* was issued, however, the Tenth District Court of Appeals noted that "the Supreme Court of Ohio has more recently held that the right to a public trial cannot be waived by silence." *State v. Sowell*, 10th Dist. Franklin No. 06AP-443, 2008-Ohio-3285, ¶ 36, citing *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 81.

**{¶ 65}** Assuming for the sake of argument that the issue was not waived, we find no merit in Belcher's argument, because the trial court did not, in fact, close the proceedings. Belcher objected on Saturday for the first time, to the lack of public access. At that time, the trial court stated that its bailiff would instruct the Sheriff's office, which was on duty at the courthouse door, to make sure that the Sheriff knew the forum was to be open that day. Trial Transcript, Volume 5, p. 656. The record does not indicate that any person was denied access that day.

**{¶ 66}** Belcher's second argument pertains to jury prejudice, but has been waived, due

to Belcher's failure to timely object in the trial court. The concept is well-established that "[d]efense counsel's failure to object waives all but plain error." *State v. Howard*, 2d Dist. Montgomery No. 20575, 2005-Ohio-3702, ¶ 34, citing *State v. Ballew*, 76 Ohio St.3d 244, 251, 667 N.E.2d 369 (1996). We find no error, let alone plain error, because any finding of juror prejudice would have to rely on speculation. The jury knew at the outset that the trial could last until Saturday, and could just as easily have been irritated with the State for taking two days to try its case.

{¶ 67} Belcher's third complaint is that she was unable to subpoena Detective Jones to testify in her case, because the need to do so arose on Friday evening, after the clerk's office was closed. Detective Jones was the Dayton Police Officer who was called to the scene, and who questioned Belcher. Jones was called as a witness in the State's case. During cross-examination, defense counsel attempted to question Jones about a statement allegedly made by another witness, Shane McDermott. Trial Transcript, Volume 5, p. 634.

{¶ 68} When the State objected on the basis that the defense had failed to question McDermott about this, the defense argued that the evidence was not being used as impeachment but as an excited utterance under Evid.R. 803(2). *Id.* at 635. The trial court rejected that theory. Subsequently, the defense tried to qualify and admit the police report as a public record under Evid.R. 803(8). *Id.* at 637-642. During the bench conference on this latter issue, defense counsel argued that if the court ruled against her on whether the report could be used as substantive evidence, she would like to ask the witness if McDermott had made the statement to him. The court also refused this request. *Id.* at 643.

{¶ 69} Defense counsel then asked the court to place Detective Jones under subpoena

so that he could be called during the defense case.  The court again refused.  *Id.* at 643-644.  The court also refused counsel's request to continue the trial until Monday so that Jones could be subpoenaed.  *Id.* at 644.

{¶ 70}   The following day (Saturday), Belcher objected to having court held on Saturday, noting that by the time Jones had testified, the clerk's office was closed, and counsel could not obtain a subpoena to compel him to testify.  As was noted, the court overruled the objection.  At that point, defense counsel did not proffer the anticipated testimony, nor did she proffer the police report into evidence.  Thus, there is no record of what McDermott's statement might have been, other than defense counsel's question to Detective Jones, which is not evidence.

{¶ 71}   Essentially, what Belcher challenges is the trial court's refusal to continue the trial.  "The grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge."  *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981), syllabus.  In *Unger*, the Supreme Court of Ohio held that:

> In evaluating a motion for a continuance, a court should note, inter alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.  (Citations omitted.)  *Id.* at 68.

{¶ 72}    In rejecting Belcher's request, the trial court noted that the case had been set for jury trial for many months, and that each time it had been set, it was reset due to a motion of the defense.   The court further observed that the parties were notified well in advance that the case would be heard on Saturday if it lasted three days, because the court already had other cases set on Monday.   In addition, the court stated that all discovery had been prepared and transferred to the parties the month before trial.   The court stressed that Jones was known as a witness, and that the defense could have subpoenaed Jones as it had numerous other witnesses.   Instead, the defense failed to do so.   Finally, the court stated that the parties had also been made aware that the court had surgery scheduled.

{¶ 73}    Under the circumstances, the   trial court did not abuse its discretion in refusing to continue the trial.   Accordingly, the Third Assignment of Error is overruled.


V.   Did the Trial Court Err in Refusing to Instruct on Affirmative Defenses?

{¶ 74}    Belcher's Fourth Assignment of Error states that:

The trial court erred when it refused to instruct the jury on both self-defense and the defense of another because the Defendant did not testify in her own defense.

{¶ 75}    Belcher contends under this assignment of error that the trial court erred in refusing to instruct the jury on the affirmative defenses of self-defense and defense of others.

{¶ 76}    The decision to give a requested jury instruction is a matter left to the sound discretion of the trial court, and the court's decision will not be disturbed on appeal absent an abuse of discretion.   *State v. Kleekamp*, 2d Dist. Montgomery No. 23533, 2010-Ohio- 1906, ¶

35, citing *State v. Davis*, 2d Dist. Montgomery No. 21904, 2007-Ohio-6680, ¶ 14.  "The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue."  *State v. Melchior,* 56 Ohio St.2d 15, 381 N.E.2d 195 (1978), paragraph one of the syllabus.

{¶ 77}    In *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, the Supreme Court of Ohio elaborated on its decision in *Melchior*, noting that:

> In *State v. Melchior* (1978), 56 Ohio St.2d 15, 20, 10 O.O.3d 8, 381 N.E.2d 195, we held that in order for a defendant to properly raise an affirmative defense, " 'evidence of a nature and quality sufficient to raise the issue must be introduced, from whatever source the evidence may come.' Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of the defense." *Id.*, quoting *State v. Robinson* (1976), 47 Ohio St.2d 103, 111–112, 1 O.O.3d 61, 351 N.E.2d 88.  We expressly cautioned, however, that "[i]f the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted." *Id.*  Moreover, the trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus. *Fulmer* at ¶ 72.

{¶ 78}    For the reasons previously mentioned in the discussion of the First Assignment of Error, the trial court did not abuse its discretion in refusing to instruct the jury on self-defense or defense of others.   The defense did not raise sufficient evidence with regard to either of these defenses.   There was no evidence upon which a reasonable person would have a question regarding whether Wiley was at fault in creating the situation that caused Belcher's use of force. Thus, Belcher's defenses fail on the first prong of the self-defense analysis.  *Hamrick*, 9th Dist. Lorain No. 09CA009628,  2010-Ohio-3796, at ¶ 13.   And, since Belcher was stepping into Wiley's shoes in asserting  defense of others, the trial court correctly concluded that an instruction on defense of others was not warranted.

{¶ 79}    In addition to basing her self-defense claim on Wiley, Belcher claims that she was acting in her own self-defense when she pushed Bachmann and when she hit Koeser. Again, however, Belcher failed to submit evidence upon which a reasonable person could conclude that she was not at fault in creating the situation.   Belcher claims that some force was needed for her to avoid being "shoved" by Bachmann and to get free from Koeser.    However, the evidence that was submitted does not support these assertions.

{¶ 80}    The only witnesses who testified on these assaults indicated as follows:

(1)   Staff members "just kind of stood in the way between Room 32 and towards the trauma or the trauma bay," and Bachmann was trying to calm the visitors down (Wooddell testimony, Trial Transcript, Volume 2, p. 158);

(2)   Belcher was drunk, and when Bachmann stepped in front of Belcher when Belcher came out of Room 32, Belcher grabbed Bachmann by the arms and pushed her so that she fell and slid across the floor (Bachmann testimony, Trial

Transcript, Volume 2, pp. 295-296);

(3)    Bachmann put her arms out to block Belcher from going towards McDermott, and Belcher pushed Bachmann in the upper chest area, causing her to fall down (Koeser testimony, Trial Transcript, Volume 3, pp. 360-361);

(4)    Bachmann was standing in the doorway of Room 32, with her arms out, about two feet from Belcher, telling her to stay in the room.  At that point, Belcher grabbed Bachmann by the shoulders and "slams her, like off to the side." Bachmann then landed at the witness's feet.   (Wetzell testimony, Trial Transcript, Volume 4, pp. 576-577).

**{¶ 81}**    The record is devoid of evidence indicating that Belcher was not at fault in initiating the events that led to her use of force towards Bachmann.   Furthermore, when Koeser came to Bachmann's defense, Koeser was attempting to remove Belcher from the scene she had created and to get her back in the room.   This was a situation that was caused by Belcher's aggressive acts.   Instead of complying and ceasing violent behavior, Belcher began swinging at Koeser with a closed fist, attempting to hit her – which she eventually succeeded in doing. Belcher persisted in this conduct despite Bachmann's request that Belcher stop trying to hit Bachmann and Koeser.   (Bachmann testimony, Trial Transcript, Volume 3, p. 304.)

**{¶ 82}**    Again, there is no evidence upon which a reasonable person would have a question regarding whether Wiley, and then, Belcher, was at fault in creating the situation. Accordingly, the trial court did not abuse its discretion in refusing to instruct the jury on self-defense and defense of others.

**{¶ 83}**    The Fourth Assignment of Error is overruled.

### VI.   Was the Defendant Denied Her Right of Confrontation?

**{¶ 84}**   Belcher's Fifth Assignment of Error is as follows:

The trial court denied the Defendant her constitutional right to confrontation.

**{¶ 85}**   Under this assignment of error, Belcher challenges the trial court's refusal to let her cross-examine two State witnesses about meetings held by MVH legal counsel to discuss the incident.   Belcher also contends that the trial court erred in refusing to allow her counsel to cross-examine Sergeant Van Dohre about his bias towards Belcher, or to impeach Van Dohre when defense counsel was "surprised" by his testimony.

**{¶ 86}**   "The Confrontation Clause of the Sixth Amendment to the United States Constitution gives the accused the right to be confronted with the witnesses against him. However, the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis sic.)   *State v. Lang,* 129 Ohio St.3d 512, 2011-Ohio-4215,  954 N.E.2d 596, ¶ 83, quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985).   "Accordingly, the court has 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' "   *State v. Warmus*, 197 Ohio App.3d 383, 2011-Ohio-5827, 967 N.E.2d 1223, ¶ 64, (8th Dist.), quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).   "To establish a Confrontation Clause violation, the defendant must show that he was 'prohibited from

engaging in otherwise appropriate cross-examination' and '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defendant's] counsel been permitted to pursue his proposed line of cross-examination.' " *Id.*, quoting *Van Arsdall* at 680.

{¶ 87} Regarding the issue of meeting with legal counsel, Wooddell first indicated that she had been to meetings (in plural) with other staff and the legal office about what had occurred. Wooddell then said that she had attended only one meeting – a debriefing right after the incident happened, where the staff discussed a little bit of what had happened and what could have been done differently. At this point, the trial court sustained the State's objections to questions about how many meetings were had; about whether the legal department comes in to see if there is any liability to the hospital; about whether Wooddell was concerned about her own liability; and about whether Wooddell remembered anything that could have been done differently. Trial Transcript, Volume 2, pp. 234-237.

{¶ 88} "[T]he focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the particular witness, not on the outcome of the entire trial." *Van Arsdall* at 680. Thus, the prejudice inquiry is directed at Wooddell and how her credibility might have been differently received by the jury.

{¶ 89} As we noted earlier, there was no evidence that a civil action against MVH was contemplated. Having staff members meet with the hospital's legal department after an incident would also not be unusual. Wooddell indicated that she was present at such a meeting, and, as we said earlier, counsel could have commented on this point in closing argument. It was a collateral issue that was not relevant to whether Belcher or Wiley were at fault in creating the

events that led to their use of force. The evidence overwhelmingly established those facts.

{¶ 90} Furthermore, Wooddell admitted during testimony that she did not see Belcher push Bachmann, nor did she see Belcher strike Koeser. Wooddell only heard commotion, and the only thing she saw was Bachmann sliding across the floor. The rest of the time, Wooddell was focused on taking care of Wiley. Thus, Wooddell's testimony was not critical on these issues. In addition, Wooddell's testimony regarding the incident with Wiley was supported by several other witnesses, which we have already discussed. Accordingly, there is no basis for concluding that a reasonable jury would have received a significantly different impression of Wooddell's credibility had the defense been able to cross-examine her further about the legal meetings.

{¶ 91} Belcher contends that Koeser also admitted to attending "group meetings," but fails to cite to any part of the testimony that indicates this. Our review of the testimony indicates that Koeser stated that the employees talked about the incident a lot that day (which would be natural), but that she did not recall talking with anyone other than Bachmann before she wrote her statement. Trial Transcript, Volume 3, p. 449, and Trial Transcript, Volume 4, p. 450. Because Belcher fails to point to any instance in which the examination of Koeser was restricted, we conclude that no potential error occurred.

{¶ 92} The final issue under this assignment of error pertains to the testimony of Sergeant Von Dohre, who was a campus police officer at the hospital. At a pretrial held in September 2011, the trial court allowed defense counsel to interview the State's witnesses. According to defense counsel, Sergeant Van Dohre refused to speak with her then, because he considered himself a State's witness. When defense counsel brought this to the trial court's

attention, Van Dohre had already left. Amended Trial Transcript, pp. 16-17. There was also a dispute between the State and the defense at the time about whether the State had a right to be present in the interviews. The trial court settled the dispute and instructed the witnesses that they could not be forced at that point to speak with the defense, but that if they chose not to do so, procedures did exist under R.C. 2945.50 that could require witnesses to speak with the defense. *Id.* at pp. 22-23.

{¶ 93} The defense did not apparently elect to use such a procedure with Sergeant Von Dohre, but did decide to call him during the defense case. However, the defense also asked the court to declare Von Dohre as a hostile witness, given the background, and the court did so.

{¶ 94} On appeal, Belcher contends, again without citation to the record, that the trial court refused to let her cross-examine Von Dohre about his bias. Belcher also challenges the trial court's refusal to let her impeach Von Dohre regarding his prior inconsistent statements. However, the trial court did allow the defense to impeach Von Dohre with these inconsistent statements.

{¶ 95} At trial, Von Dohre testified that Belcher appeared to be intoxicated when she was in the dispatch center. He also testified that Belcher repeatedly apologized for what had happened. Trial Transcript, Volume 5, p. 743. Defense counsel was permitted to cross-examine Von Dohre about the fact that he had not included any such statements in the report he prepared after the incident. *Id.* at 744-747. During defense counsel's examination, the court did sustain an objection by the State, but the court nonetheless permitted Belcher's counsel to elicit the information about the prior inconsistent statements. As a result, there is no basis for a Confrontation challenge in this regard.

**{¶ 96}** The final issue occurred when defense counsel asked Von Dohre if he had an opportunity and had wanted to talk to prosecutors about the case. *Id.* at p. 748. The trial court sustained the State's objection. The court noted that it had already permitted Von Dohre to be called as a hostile witness. The court also concluded that discussions with Von Dohre and trial preparation were not relevant. Trial Transcript, Volume 6, p. 750.

**{¶ 97}** In responding to Belcher's argument, the State points out that the defense does not have a right to interview, depose, or examine a state's witness before trial. According to the State, witnesses should not have their credibility impugned because they exercise their legal right not to speak to counsel.

**{¶ 98}** The State's general proposition is correct. *See, e.g*., *State v. Zeh*, 31 Ohio St.3d 99, 105, 509 N.E.2d 414 (1987) (following the "general rule that a prosecution witness who will be attending the trial has the right to refuse an interview or deposition by the defense when the prosecution has not unduly interfered with the witness' free choice.")

**{¶ 99}** No evidence was presented to indicate that the State had unduly interfered with Von Dohre's free choice. Furthermore, one might venture to say that most police officers consider themselves "state's witnesses." Thus, allowing such issues to be interjected would unduly complicate most trials and would confuse juries.

**{¶ 100}** Assuming for the sake of argument that the inquiry would have been proper, a reasonable jury might not have received a significantly different impression of Von Dohre's credibility if the inquiry had been permitted. *Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674, at 680. In this regard, we note that defense counsel had already cast doubt on Von Dohre's credibility by revealing that he had testified about things he failed to

include in his report. The fact that Von Dohre, a police officer, did not want to speak to defense counsel would not have detracted significantly more from the jury's perception.

{¶ 101} Furthermore, even assuming that the trial court had committed error in limiting matters bearing on Von Dohre's bias as a police officer, the error was harmless beyond a reasonable doubt. "Error in the admission of evidence is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction. In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt." *Bayless*, 48 Ohio St.2d 73, 106-107, 357 N.E.2d 1035, at 106-107, citing *Abrams*, 39 Ohio St.2d 53, 313 N.E.2d 823; *Crawford*, 32 Ohio St.2d 254, 291 N.E.2d 450; *Chapman*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; and *Harrington*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284.

{¶ 102} Notably, Von Dohre's testimony was merely cumulative of the testimony of other witnesses. And, as we noted previously, the evidence of Belcher's guilt is overwhelming. The evidence of guilt would still be overwhelming, even if Von Dohre's testimony were completely discredited.

{¶ 103} Based on the preceding discussion, the Fifth Assignment of Error is overruled.

## VII. Did Cumulative Errors Deprive Defendant of a Fair Trial?

{¶ 104} Belcher's Sixth Assignment of Error states that:

The cumulative effect of the trial court's errors in the first five assignments deprived the Defendant of her due process right to a fair trial.

{¶ 105}     Under this assignment of error, Belcher contends that the cumulative effect of errors deprived her of a fair trial.  "Though a particular error might not constitute prejudicial error by itself, a conviction may be reversed where the cumulative effect of the errors deprives the defendant of a fair trial."     *State v. Moore*, 81 Ohio St.3d 22, 41, 689 N.E.2d 1 (1998), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987).   Having found no error, we cannot find cumulative error.

{¶ 106}     The Sixth Assignment of Error is overruled.


VIII.   Conclusion

{¶ 107}     All of Belcher's assignments of error having been overruled, the judgment of the trial court is Affirmed.


. . . . . . . . . . . .

FAIN, P.J., concurs.
DONOVAN, J., concurs in judgment only.


Copies mailed to:

John J. Danish
Stephanie L. Cook
Troy B. Daniels
Tina M. McFall
Hon. Deirdre E. Logan