[Cite as *State v. Joseph*, 2025-Ohio-1204.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-34 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-0567 |
| | : | |
| HERMANIO JOSEPH | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 4, 2025

. . . . . . . . . . .

R. JESSICA MANUNGO, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant Hermanio Joseph appeals from his conviction in the Clark County Court of Common Pleas of involuntary manslaughter. He was sentenced to 9 to 13½ years in prison. For the reasons that follow, the judgment of the trial court will be affirmed.

I. **Facts and Procedural History**

{¶ 2} On the morning of August 22, 2023, Gene Collier was driving a school bus full of children to their first day of school at Northwestern Elementary when a van driven by Joseph, a Haitian immigrant who did not have a driver's license, crossed the center line into the bus's lane. Collier attempted to guide his bus to the right to avoid a head-on collision with the oncoming vehicle, but Joseph's van kept its course and collided with the bus. The impact caused the bus to veer off the road; it rolled and then came to rest on its top in the ditch. Bystanders rushed to the scene to help the children. Many were injured, some seriously, and A.C., who was ejected from the bus, died.

{¶ 3} Joseph was arrested and charged with one count of involuntary manslaughter and one count of vehicular homicide. Additionally, an operating a motor vehicle without a valid driver's license specification was attached to the vehicular homicide charge. Before the trial, Joseph filed a motion to change venue, citing "extensive and ongoing pre-trial publicity and media saturation." He argued that that the media coverage of the event would make it "impossible to seat an impartial jury in [Clark] County." The court denied the motion but noted that it was amenable to reconsider if, during voir dire, it became apparent that an impartial trial could not happen in Clark County.

{¶ 4} The case proceeded to trial in the spring of 2024. Before testimony began, the parties engaged in a detailed and thorough voir dire process; the inquiries from both attorneys revolved around the potential jurors' connections to the Northwestern community and their feelings toward Haitians, a rapidly growing population in the Springfield region of which Joseph was a member. After many potential jurors were

excluded, the attorneys for Joseph and the State winnowed the pool to 12, with three alternates. Defense counsel did not reassert the motion to change venue, and the trial court did not sua sponte raise the issue either. The jury returned with guilty verdicts on both counts after two days of testimony.

{¶ 5} At the disposition, the parties agreed that the involuntary manslaughter and vehicular homicide counts would merge for sentencing, and the State elected to proceed on involuntary manslaughter, as it was a first-degree felony. The trial court imposed a prison term of 9 to 13½ years after considering statements from the victim's family, attorneys from both sides, and Joseph himself.

{¶ 6} Joseph appeals, raising three assignments of error.

## II.    Venue Change and Actual Bias of Jurors

{¶ 7} In his first and second assignments of error, Joseph presents connected arguments that center on whether he had a fair trial in Clark County because of unfavorable media coverage. He argues that the trial court should have granted his pretrial motion for a change of venue, and then reconsidered the decision after voir dire, because some jurors demonstrated bias. We will address these issues in a manner that facilitates our analysis.

{¶ 8} Upon the motion of any party or upon its own motion, a trial court may transfer a case to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending. Crim.R. 18(B). This motion must be made within 35 days after arraignment or seven days before trial, whichever is earlier, or at such

reasonable time later as the court may permit.

{¶ 9} Trial courts have a duty to protect defendants from prejudicial publicity that renders the jury's deliberations unfair. *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). "Even so, pretrial publicity – even pervasive, adverse publicity – 'does not inevitably lead to an unfair trial.' " *State v. Grate*, 2020-Ohio-5584, ¶ 50, quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554 (1976). The Ohio Supreme Court has long held that "voir dire examination provides the best test as to whether adverse publicity necessitates a change of venue." *State v. Issa*, 93 Ohio St.3d 49, 62 (2001); *State v. Swiger*, 5 Ohio St.2d 151, 164 (1966); *State v. Bayless*, 48 Ohio St.2d 73, 98 (1976), *vacated on other grounds*, *Bayless v. Ohio*, 438 U.S. 911 (1978) ("a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury"). A defendant arguing that pretrial publicity has denied him or her a fair trial must show that one or more jurors were *actually* biased. (Emphasis added.) *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001).

{¶ 10} There are, however, rare cases in which pretrial publicity can be so damaging that prejudice may be presumed without a showing of actual bias. *Grate* at ¶ 55. To prevail on a presumed prejudice claim, the defendant must make a "clear and manifest showing . . . that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act." *Id.*, quoting *State v. Herring*, 21 Ohio App.3d 18 (9th Dist. 1984), syllabus.

{¶ 11} The decision on a change of venue rests in the sound discretion of the trial court. *Treesh* at 463. Absent a clear showing of an abuse of discretion, the decision of

the trial court must remain. *State v. Landrum*, 53 Ohio St.3d 107, 116 (1990).

{¶ 12} Joseph's first argument is that the alleged negative publicity against Haitians in general, and his incident in particular, made it virtually impossible to obtain an impartial jury in Clark County.

{¶ 13} The evidence in the record of pretrial publicity comes mainly in the form of attorneys mentioning it a limited number of times during voir dire. Both attorneys spoke about it once, generally, to the entire group.

**Prosecutor**: Okay. All right. There's been a great deal of media attention on this case. Who saw this or heard about this on TV, radio, somewhere?

(JURORS RESPOND AFFIRMATIVELY)

**Prosecutor**: [Juror 12], I'm going to pick on you again one more time. Would it surprise you if I told you that the media is not always right?

**Juror 12**: Not at all.

**Prosecutor**: And would it surprise you if I told you sometimes law enforcement and prosecutors withhold information from the media?

**Juror 12**: Not at all.

**Prosecutor**: Okay. Does anyone believe that because they have heard something on the news or in the paper or on the radio that that's the whole truth?

(JURORS RESPOND NEGATIVELY)

**Prosecutor**: And can you all kind of put aside what you've seen or heard and just listen to the facts that you hear today?

(JURORS RESPOND AFFIRMATIVELY)

    **Prosecutor**: Anybody have any problems with that?

    (JURORS RESPOND NEGATIVELY)

Trial Tr. at 48-49. Defense counsel also briefly mentioned it.

    **Defense Counsel**: The press is not always right. Sometimes they give you some of the facts. Sometimes they give you none of the facts. It depends on what you're listening on what the fact is. So many times, we've all had experiences listening to initial reports on tv, on the radio, and it turns out to be completely wrong. Anybody had that experience?

    (JURORS RESPOND AFFIRMATIVELY)

Trial Tr. at 61. Both sides then asked a very limited number of questions to individual jurors.

    **Prosecutor:** And are you aware of any pretrial publicity on this, have you heard about it?

    **Juror 3:** I had heard about it, yes.

    **Prosecutor:** Do you think you could set that aside?

    **Juror 3:** Yeah.

Trial Tr. at 64.

    **Defense Counsel**: Have you heard anything about this case?

    **Juror 11**: I heard about the case when it, you know, in August. And then I honestly hadn't heard anything about it until I walked in here today.

Trial Tr. at 101.

    **Defense Counsel**: Have you watched the videos that were on tv?

**Alternate 3**: No. I don't watch much local news.

Trial Tr. at 120-121.

{¶ 14} While it appears that many (but not all) of the members of the jury pool had heard about the case before reporting for duty, two things are clear from the transcript. First, there appeared to be a "healthy skepticism" of the media coverage. Both attorneys brought up the fact – and all the jurors concurred – that not everything you hear in the news is true. Two of the individual jurors also confirmed that the coverage was not all-consuming, as Joseph alleges. More importantly for the fairness of the proceedings, however, was that the jurors, when asked, both en masse and individually, confirmed that they could put the media coverage aside and be fair and impartial.

{¶ 15} Joseph's pretrial motion to change venue did not add anything to the evidence, either. Defense counsel did not reference any particular newspaper articles, television news stories, or social media posts; the motion to change venue only stated that it is "self-evident" that the saturation of media coverage would make it impossible to get a fair trial.

{¶ 16} We do, however, take judicial notice of online articles that Joseph's appellate counsel attached to his reply brief to this court. The articles range from a reputable publication that jurors would have likely seen, such as the Springfield New-Sun, to a fringe publication like "The Post Millennial." Regardless of the publisher, these articles reflect that there was at least some coverage of this crash, and the Haitian community in general, in the public realm in 2023. Even accepting that there was news coverage of the case (there was), there is no evidence in the record – let alone a clear and manifest

showing – that it rose to the level of causing presumed prejudice. The record just does not indicate a problem. Having looked at the big-picture view, we must now turn to the individual members of the jury to see if there was any indication of actual bias.

{¶ 17} "Pursuant to the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed the right to an impartial and unbiased jury." *State v. Froman*, 2020-Ohio-4523, ¶ 49, quoting *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004). "Voir dire serves the purposes of allowing the court and the parties to identify and remove jurors to ensure an impartial jury. Although counsel and the trial court have broad discretion in determining a juror's ability to be impartial, the decision whether to seat a biased juror cannot be a discretionary or strategic decision." (Citations omitted.) *Id.*

{¶ 18} A defendant's Sixth Amendment right to an impartial jury has been violated when a juror who has exhibited actual bias against the defendant is seated on the jury. *Id.* at ¶ 49. When this happens, the conviction must be reversed. *State v. Glass*, 2024-Ohio-4535, ¶ 42, citing *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000).

{¶ 19} "Actual bias is 'bias in fact' – the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997). It can be shown by a juror's admission or circumstantial evidence of the juror's biased attitude. *Froman* at ¶ 50, citing *Hughes v. United States,* 258 F.3d 453, 459 (6th Cir. 2001).

{¶ 20} The transcript reveals that the attorneys in this case conducted a thorough voir dire. Generally, their questions pressed the potential jurors on several main topics: their ability to be fair and impartial, their connections to the Northwestern community, and

their feelings about the Haitian immigrants in the area. There was not a significant focus on media coverage.

{¶ 21} After dismissing many potential jurors, the sides settled on the following people:

**Juror 1**: Had been deployed overseas for the past nine months. Had not heard or seen anything about the crash. Had no contacts with the Northwestern community and no contact with Haitians.

**Juror 2**: Did not know any of the families connected with the crash. Had no interactions with the Haitian community. Could be fair and impartial.

**Juror 3**: No connection to the Northwestern community. Had positive interactions with members of the Haitian community. Could be fair and impartial.

**Juror 4**: No experience with any Haitians. No connection to the Northwestern community but read about the case in the newspaper. Could be fair and impartial.

**Juror 5**: Did not know anyone on the bus. No negative interactions with the Haitian community. Could be fair and impartial.

**Juror 6**: Experience with Haitians had been positive.

**Juror 7**: No connection to the Northwestern community. No negative interactions with Haitians but had heard both positive and negative things about them. Could be fair and impartial.

**Juror 8**: Had Haitian immigrants as employees and the experience was

positive.

**Juror 9**: Grew up with the father of a child on the bus, but no contact with him. No personal experience with Haitians but had heard negative things about them. Could be fair and impartial.

**Juror 10**: Had heard negative things about Haitians but had nothing personally against them. Daughter was a preschool teacher in the Northwestern district and had talked about the incident with her. Was equivocal about being impartial.

**Juror 11**: No contact with any Haitians. No connections to the Northwestern community. Could be fair and impartial.

**Juror 12**: Daughter played basketball with the older sister of a girl on the bus, but did not know the parents at all and had no contact regarding the incident. Works with Haitians and had positive experiences. Could be fair and impartial.

**Alternate 1**: No connection to Northwestern community. Positive experience with Haitians.

**Alternate 2**: No connection to Northwestern Community. No interaction with Haitians.

**Alternate 3**: No connection to Northwestern community. Could be fair and impartial.

**{¶ 22}** Of the empaneled jurors, Joseph identifies three of them as being problematic: Jurors 9, 10, and 12. According to Joseph, Jurors 9 and 12 should have

been removed (for cause) because they "personally knew the child victims" or the victims' families. However, as to these two, Joseph overstates their connection to the crash. Juror 9 testified that she "kind of grew up" with the father of a victim, whom she described as "my mom's best friend's son," but had had no contact or communication with him. Juror 12 acknowledged that his daughter played "middle school ball" with the older sibling of a victim, but he had had "zero" communication with the family. In fact, he had never spoken to them. Both Jurors, despite their (limited) connection to the incident, were clear that they could be impartial. Jurors 9 and 12 clearly did not exhibit actual bias.

{¶ 23} Juror 10, however, is a closer call as to actual bias. As to the question of the Haitian community, Juror 10 noted that while she had nothing personal against Haitians and had no experience with anyone from that background, she had heard negative things. There is nothing about her statements regarding Haitian immigrants that would lead us to conclude that she was biased in that regard. There is a question, though, about her connection to the crash.

{¶ 24} When asked if she could be impartial due to her connection to the Northwestern community, she responded: "I question it to myself because my granddaughter is a preschool teacher there and I've, we've talked extensively of the happenings of that day and the visual aspect of everything so I'm, it's a fine line with me." Trial Tr. at 55. Juror 10's honest self-reflection fell short of being a smoking gun for either side. She did not confirm her impartiality, but neither did she rule it out. This answer, however, was in contrast with a statement she made earlier in voir dire in which she affirmed that, even though she had relatives in law enforcement, she could still be fair

and impartial. Trial Tr. at 35.

{¶ 25} Even still, some modicum of doubt is not dispositive. "A juror's express doubt as to her own impartiality on voir dire does not necessarily entail a finding of actual bias. The Supreme Court has upheld the impaneling of jurors who had doubted, or disclaimed outright, their own impartiality[.]" *Miller v. Webb*, 385 F.3d 666, 674 (6th Cir. 2004). Whether Juror 10 was fit to be on the panel should be determined by all her statements. Her noting that she would "walk a fine line" in terms of impartiality – which we do *not* believe is the same as her saying she could not be impartial – must be taken in context with the other things she said. She told the attorneys that she had nothing personal against Haitians and that she could be impartial even though she had family members in law enforcement. Accordingly, we cannot conclude that Juror 10 exhibited actual bias against Joseph.

{¶ 26} Based on the prospective jurors' responses during voir dire, the trial court's failure to reconsider its denial of the motion was not an error. Joseph's first and second assignments of error, which relate to the trial court's denial and then non-reconsideration of his motion for a change of venue, are overruled.

### III.    Ineffective Assistance of Counsel

{¶ 27} In this third and final assignment of error, Joseph claims that his trial counsel was ineffective when he did not renew the motion to change venue after voir dire was completed. It is also Joseph's contention that trial counsel was ineffective for not "exercise[ing] peremptory and for-cause strikes in a reasonable manner." Appellant's brief at 19.

{¶ 28} To prevail on an ineffective assistance of counsel claim, Joseph must prove that his attorney was ineffective under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The test has two parts. First, he must show that counsel's performance was deficient. *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 29} With respect to the first prong, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585 (1998). To demonstrate prejudice, the second prong, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1998), first paragraph of the syllabus.

{¶ 30} With respect to Joseph's contention that trial counsel failed to strike jurors in a "reasonable manner," we note that defense counsel used the five statutorily allotted peremptory challenges (R.C. 2945.21) and the five agreed-upon for-cause challenges. In addition, defense counsel tried an additional for-cause challenge that the State opposed; the trial court ultimately overruled the challenge. That means defense counsel was at least partially responsible for the removal of 10 potential jurors. Nevertheless, Joseph argues that Jurors 9, 10, and 12 should have been struck.

{¶ 31} "Decisions on the exercise of peremptory challenges are a part of trial

strategy." *State v. Trimble*, 2009-Ohio-2961, ¶ 99. Here, four jurors and one alternate – the maximum number permitted by statute – were peremptorily struck by defense counsel during voir dire. We must give deference to trial counsel, who was in a much better position to determine which potential jurors should have been challenged. Simply because Joseph now believes different people should have been taken out of the jury pool does not mean counsel's performance was so bad that he was not functioning as the 'counsel' guaranteed by the Sixth Amendment. This was a matter of trial strategy.

**{¶ 32}** As for counsel's failure to renew the motion to change venue, even if he could get past the first prong of the *Strickland* analysis, we would find that Joseph was not prejudiced because there was not a clear and manifest showing that pretrial publicity was so pervasive and prejudicial that an attempt to seat a jury would be a vain act, or that any juror was actually biased because of it.

**{¶ 33}** Joseph's third assignment of error is overruled.

**IV.     Conclusion**

**{¶ 34}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.