[Cite as *State v. Asaba*, 2025-Ohio-4468.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 114739 |
| MUSA ASABA, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 25, 2025

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-688705-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kenan Mack, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Thomas Lampman, Assistant Public Defender, *for appellant*.

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Musa Asaba ("Asaba") appeals an evidentiary ruling that the trial court made during his trial. After a review of the record and law, we find no error and affirm.

# I. Procedural History

{¶ 2} In January 2024, Asaba was charged in a five-count indictment with burglary in violation of R.C. 2911.12(A)(1) (Count 1), violating a protection order in violation of R.C. 2919.27(A)(3) with a furthermore specification that the violation was a felony (Count 2), violating a protection order in violation of R.C. 2919.27(A)(1) with a furthermore specification that the offense was a felony (Count 3), menacing by stalking in violation of R.C. 2903.211(A)(1) with a furthermore specification alleging that Asaba threatened physical harm (Count 4), and intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04(A) (Count 5).

{¶ 3} In May 2024, Asaba filed a "notice of alibi," indicating that he was "outside the [S]tate of Ohio when the alleged victim stated that the burglary and violation of the protection order were supposed to be occurring." The matter was tried before a jury on August 26, 2024. The jury found Asaba guilty of Counts 3 through 5. Sentencing was continued until his other pending case, Cuyahoga C.P. No. CR-24-691076-A was resolved. At sentencing, he was sentenced to "two years of community control on each count."

{¶ 4} This appeal followed; Asaba assigns a single error for our review:

The trial court erred by excluding Asaba's testimony about [the victim's] emotional state.[1]

---

[1] The facts section of Asaba's brief references another incident where Asaba's counsel "did not notice or correct" the State's questioning while establishing the timeline of Asaba's work trip. Since the issue was raised in the facts section, the discussion is

## II. Factual History

{¶ 5}  The charges in this matter stem from a contentious divorce and separation between Asaba and the victim.  The first two counts pertained to a specific incident on July 14, 2022, while the remaining counts derived from separate instances of Asaba's alleged misconduct.

{¶ 6}  The victim testified that she was born in the Democratic Republic of the Congo ("DRC") and eventually went to Uganda as a refugee, which is where she met Asaba.  She estimated that she had been romantically involved with Asaba on-and-off beginning in 2008; they married in Uganda in 2015 and came to the United States that same year.  After immigrating to the United States, the pair lived together and had five children.  Sometime thereafter, the victim filed for divorce.

## A. July 14, 2022

{¶ 7}  Counts 1 and 2 pertained to an event occurring on July 14, 2022.  On July 12, two days before the alleged incident, Asaba and the victim attended a hearing where the victim requested a protection order against Asaba.  While the court took the matter under advisement, it issued an emergency temporary protection order.  On July 15, 2022, the court denied the victim's request for a protection order and terminated the emergency protection order that had been in place while the court considered the matter.

---

limited and was not made a separate assignment of error.  Accordingly, we will not address these alleged errors.  App.R. 12; App.R. 16.

{¶ 8} The victim testified that at some point at night on July 12th, she was in the basement doing laundry when she received a text message from one of her children stating that Asaba was in the home. On cross-examination, she admitted that the incident did not happen on July 12th, but rather on July 14th. The victim stayed in the basement, turned off the lights, and called the police. She stayed on the phone with the 911 dispatcher until the police arrived at her home, but Asaba had left by the time they arrived. Since Asaba drove off and could come back, the police advised the victim to take her children to another location for the evening.

{¶ 9} Cleveland police officer Brittan Jackson ("Ofc. Jackson") testified that on July 14th into the morning hours of July 15th, he was patrolling with a partner when they received a radio assignment around midnight to respond to a domestic-violence incident. The officers arrived at the victim's home and learned that the person who had allegedly violated the protection order had left the scene in his silver Toyota Highlander. The victim came outside, appearing "visibly shaken." (Tr. 231.) The victim informed the officers that Asaba, whom she had a protection order against, had entered the home. Ofc. Jackson confirmed that he advised the victim to take the children to another location for the evening.

{¶ 10} S.O., age 15, testified that on July 14, 2022, she was at home with her mother and four siblings. Her father, Asaba, used to live there, but was not living there on the date of the incident. According to S.O.'s testimony, she was in her bedroom on the main floor of the home when her father walked in and asked about her mother's whereabouts in a "panicked" voice. (Tr. 253.) S.O. responded that she

did not know where her mother was, because she was "told to" and also because she "knew that he wasn't supposed to be at the house[.]" (Tr. 253.) She also noted that something "felt off" about the situation, so she texted her mother after he left the room. (Tr. 254.) According to S.O., her father searched throughout the house and asked all of her siblings where mother was; none revealed where mother was located, and Asaba left the home.

{¶ 11} H.O., age 13, testified he was at the family home on the date of the incident and agreed that at the time of the incident, Asaba had not been living in the home. H.O. was upstairs playing video games when he heard his father, Asaba, come upstairs. He testified that his father was "angry, rushing . . . like he was trying to do something, look for something." (Tr. 270.) Father also asked H.O. where his mother was, and he told his father that he did not know because he "felt the need to protect her" since mother and father argue frequently and because he knew that his father was not supposed to be at the home. (Tr. 270.) His father retreated downstairs, and H.O. also texted his mother, asking why Asaba was in the home. H.O. testified that his mother took him and his siblings to his cousin's home where they stayed for the night.

{¶ 12} Detective Orville Taylor ("Det. Taylor") testified that he was assigned this case sometime after the July 14 incident. When asked if there was an active protection order at the time of the July 14 incident, Det. Taylor responded affirmatively and testified that he was able to verify this via a journal entry that granted an emergency protection order following the July 12 court hearing.

## B. Counts 3 Through 5

{¶ 13} In addition to the incident occurring on July 14, the victim also testified about an incident in February 2023, where she made a police report because of Asaba's activities, and at this time, she did have a valid protection order. She reported that Asaba had been repeatedly calling her and asking her to drop the charges against him. She also testified that Asaba had sent other people to her home, and specifically named one of these individuals as Obedi Aruna ("Obedi"). She testified that Obedi, whom she did not immediately recognize, came to her home and reminded her that they met at a Muslim community meeting and advised her to drop the charges and leave the home because her life was at risk.

{¶ 14} Cleveland police officer Rico Levert ("Ofc. Levert") testified that he took a report in February 2023, when the victim came into the police station. He recalled that she "stated she wanted to report that her ex-husband was in violation of a protection order. He had friends, I believe, contacting her for him trying to get her to meet him somewhere." (Tr. 310-311.) Ofc. Levert testified that after they began talking, he realized he had taken a report from the victim about a year prior that also pertained to Asaba.

{¶ 15} Det. Taylor also testified that as he further investigated this matter, the victim provided him with text messages from Asaba that were written in another language that Det. Taylor translated himself with Google Translate. Det. Taylor described the gist of the text messages as "trying to get her to drop the charges, not

continue with the case, she's costing him a lot of money.  I believe one of them was about they should get back together and live as husband and wife." (Tr. 408.)

{¶ 16} Nzitunga Gilbert Semivumbi ("Semivumbi") testified that he is the victim's brother and that they were both born to the same family in the DRC and then became refugees in Uganda.[2]  Semivumbi testified that he came to the United States in 2013, and his sister and Asaba, who met and married in Uganda, moved to the United States sometime after he did.  According to Semivumbi, he had testified in court on behalf of the victim pertaining to an earlier matter.  Afterwards, Asaba "called [him] and . . . told [him] to stop from coming [sic] to these cases." (Tr. 293.)  He elaborated, "[Asaba] call[ed] several times and asked me not to get involved in his cases until I had to block his number from my phone.  And when I blocked him he did the same through other people, at least two people, and they were telling me to stop from getting involved in his own business." (Tr. 293.)

{¶ 17} Obedi testified that he arrived in the United States in 2018 from Zimbabwe, where he was a refugee.[3] Like Asaba, the victim, and Semivumbi, Obedi was born in the DRC.  He testified that he met Asaba and the victim in 2021, and that "[n]either one of them is my close friend.  We're just in the Muslim community

---

[2]Interpreters relayed Semivumbi's questioning and testimony.

Semivumbi elaborated that the victim is not his biological sister, but that their fathers are brothers.  "In Africa I consider that relationship as my sister.  And when we are here, we have to be closer and consider each other as brother and sister." (Tr. 304.)

[3] Interpreters relayed Obedi's questioning and testimony.

and that's how we got to know all of them." (Tr. 321.) Obedi testified that he was only familiar with the victim because of a meeting where the topic of conversation was Asaba and the victim's relationship. (Tr. 323.) He testified that in the Congolese community, it is typical for other members of the community to be involved in "intimate matters" like this. (Tr. 324.)

{¶ 18} According to Obedi, Asaba contacted him sometime in 2022 and gave him the victim's telephone number and address and asked Obedi to contact her and "ask her to drop the case against him." (Tr. 322.) Similar to Semivumbi, Obedi testified that Asaba, upon finding out that he had testified for the victim in another matter, "told me I should find a way to excuse myself, or to be unavailable so that I don't take part in the hearings." (Tr. 326.) According to Obedi's testimony, Asaba threatened to sell the marital home and deny the victim access to their children unless the case was dropped. Obedi's testimony expressed that there was significant tension between Asaba and the victim and that he "became scared" for the victim because Asaba indicated to him that "if things didn't go [Asaba's] way, he may seek revenge on [the victim.]" (Tr. 327.)

### C. Asaba's Defense

{¶ 19} Asha Omari ("Omari"), Asaba's younger sister, testified in Asaba's defense.[4] Omari testified that she received a phone call from the victim who sounded extremely angry. She described the victim's commentary as "shocking."

---

[4] Interpreters relayed Omari's questioning and testimony.

(Tr. 470.) As a result of the phone calls, she warned Asaba that the victim was saying threatening things, including wishing death upon him. On cross-examination, Omari admitted that the victim had been angry and impassioned because Asaba had drained her primary bank account that she used to provide for the children.

{¶ 20} Asaba testified in his own defense.[5] He testified that after the hearing on July 12, he immediately drove to Aliquippa, Pennsylvania and then Buffalo, New York and then Burgaw, North Carolina as part of his work as a truck driver, and because of the time that these drives took, could not have been at the victim's home on July 14, 2022. He maintained that by the time he went to the home, it was July 16, 2022, and the pending protection order had been denied and the emergency protection order was lifted.

{¶ 21} Asaba admitted that after the July 14 protection order was denied, the victim did obtain a valid protection order in October 2022. He testified that while this protection order was in place, he did not visit the home, send emails, send text messages, or ask anyone to contact her on his behalf. He also denied intimidating anyone and testified that he gave his phone to the police to search and they could not find any indication that he contacted the victim.

{¶ 22} Asaba generally testified that the victim was bringing these charges maliciously and that she made their children testify in her favor because she wanted to keep the marital home and custody of the children. He also insinuated that the

---

[5] Asaba's questioning and testimony were relayed via an interpreter.

victim was having extramarital affairs and a sexual relationship with the men who testified in her case-in-chief.

### III. The Appeal

{¶ 23} During trial, Omari testified about a phone call that she had with the victim during which the victim made threatening statements towards Asaba. Asaba's sole assignment of error challenges the court's evidentiary rulings that ultimately precluded Omari from discussing the contents of her phone call with the victim.

{¶ 24} Asaba contends that the trial court's ruling that Omari's testimony constituted inadmissible hearsay was in error. He argues that the trial court precluded Omari from testifying as to the contents of the phone call because this evidence was being offered for the truth of the matter being asserted. The State's brief addresses the admission of the actual audio recording of the phone call, which Asaba's brief does not address.

{¶ 25} Hearsay is inadmissible if it is offered "to prove the truth of the matter asserted." Evid.R. 801(C). Here, the issue is whether Omari's testimony as to the contents of the phone call was offered "to prove the truth of the matter asserted," as the trial court held, or for another reason. Trial courts have broad discretion in the admission or exclusion of evidence "unless it has clearly abused its discretion and the defendant has been materially prejudiced[.]" *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967).

{¶ 26} "Testimony which explains the actions of a witness to whom a statement was directed . . . is not hearsay." *State v. Maurer*, 15 Ohio St.3d 239, 262 (1984). A statement is also nonhearsay if it is offered to prove "a statement was made and not for its truth" as well as to show a state of mind or explain an action. (Citations omitted.) *Id.*

{¶ 27} Asaba argues that Omari's testimony was offered "to explain her belief that [the victim] was going to 'try and prevent [Asaba] . . . from having a successful life here in the United States.'" (Tr. 464.) We agree. The testimony regarding the contents of the phone call was not offered to prove that the victim maliciously harmed Asaba. Rather, it was offered to demonstrate three distinct things, all of which are nonhearsay: (1) why Omari felt that she needed to warn Asaba that he was in danger, (2) that the victim's state of mind towards Asaba was angry, impulsive, and threatening, and (3) that the victim could be fabricating these claims of domestic violence and violation of a protection order because she wanted to complicate Asaba's life. Thus, the court erroneously ruled that this testimony should be excluded as inadmissible hearsay.

{¶ 28} Nonetheless, "an error in the admission of evidence is harmless if there is no reasonable possibility that the evidence may have contributed to the accused's conviction, and that in such cases there must be overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction." *State v. DeMarco*, 31 Ohio St.3d 191, 195 (1987), citing *State v. Bayless*, 48 Ohio St.2d 73 (1978).

{¶ 29} Asaba's argument that this error was prejudicial deduces that this testimonial evidence was pivotal in demonstrating the victim's credibility. After a thorough examination of the record, however, we disagree. Comparing this single erroneous hearsay ruling to the totality of the evidence presented at trial, we cannot say that there is a strong probability that Omari's statements as to the contents of the phone call would have resulted in Asaba's acquittal on the remaining counts. This was not the only evidence offered to impeach the victim's credibility.

{¶ 30} Indeed, the jurors heard Asaba's testimony that (1) the victim was lying to punish him and take the family home, (2) the victim had coached her children into testifying in her favor, and (3) the victim allegedly had a romantic or sexual relationship with one or both of the men who testified on her behalf. The jury also had the benefit of hearing the victim's direct testimony, cross-examination, and even Omari's cross-examination, during which Omari indicated that the victim called her because Asaba drained the bank accounts and she was upset. All of this evidence enabled the jury to determine the victim's credibility and indeed, the jury presumably did not find the victim credible as to the events that occurred on July 14, 2022, because Asaba was acquitted of all charges arising from that incident. Accordingly, while it was error for the trial court to exclude Omari's testimony about the phone call, we cannot find that this error was prejudicial to Asaba. Accordingly, we overrule Asaba's assignment of error.

{¶ 31} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EMANUELLA D. GROVES, P.J., and
MARY J. BOYLE, J., CONCUR